NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MARLAND ONE–WAY CLUTCH CO., INC., Respondent.

MARLAND ONE–WAY CLUTCH CO., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 74–1348, 74–1349, 74–1413 and 74–1414.

United State Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1974.

Decided June 24, 1975.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 3, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, Frank C. Morris, Jr., and Abigail Cooley, N. L. R. B., Washington, D. C., for N. L. R. B.

L. Lee Burks, Jr., Park Forest, Ill. for Marland One-Way Clutch Co., Inc.

Before MARIS,* Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

These cases are before the court upon applications for enforcement and cross-petitions for review of two orders of the National Labor Relations Board. In case 13–CA–10161(61)(74–1348, 74–1413) the board found that the company violated § 8(a)(1) and (5) of the National Labor Relations Act (29 U.S.C. § 151 et seq.) by withholding payment of third quarter bonus payments in 1970 without giving the union an opportunity to bargain and by refusing to supply information regarding the method used to compute the amount of bonus payments. The board originally ordered, inter alia, that the third quarter bonus be paid, that relevant information be supplied, and that the company bargain in good faith regarding future bonus payments. Subsequently the board modified its order and ordered payment of all bonuses unilaterally withheld. In 13–CA–10823(23)(74–1349, 74–1414) the board found the company violated § 8(a)(1) of the Act by creating the impression of surveillance of the union and threatening plant closure.

## I. FACTS

Marland One-Way Clutch Co., Inc. is an Illinois corporation engaged in the manufacture of mechanical clutches. The Tool & Die Makers Lodge No. 113, International Association of Machinists and Aerospace Workers, AFL–CIO, was certified on September 14, 1970. The union's efforts to organize the company's employees were opposed by management, but the alleged violations occurred after the election.

From 1947 through 1967 the company paid a bonus to employees at Christmas. In 1968 the company began paying the bonus in quarterly installments. On several occasions, the company wrote letters or memoranda to the employees which upon reasonable interpretation could have caused the employees to think of the bonuses as part of their compensation. Some of these letters related the bonuses to hourly rates and by adding the bonuses to regular hourly rates arrived at a "Marland hourly rate total." The bonuses were paid quarterly until the third quarter of 1970, shortly after the union election, when no payment was made. The third quarter bonus has since been paid in compliance with the

---

* Senior Circuit Judge Albert B. Maris of the United States Court of Appeals for the Third Circuit is sitting by designation.

board's order,[1] but no bonuses have been paid for subsequent quarters.

When the bonus was not paid, the union representative questioned the company representative about the bonus. He was told that the decision at the particular time was to withhold payment and that the bonus was discretionary. The union representative then requested information on the bonus. The company responded:

> "*Bonus*: Christmas bonus is discretionary and based on management evaluation of business."

Shortly after that colloquy, on October 20, 1970, the union filed charges with the board which resulted in the 61 case.

On December 30, 1970, the union wrote the company with a view to further negotiations on the bonus, making the following request:

> "[W]e are hereby requesting that the Company submit in written form, as soon as possible, all information relating in any way to the Method the Company has used in Computing the Christmas bonus in the past for the employees we now represent."

The company responded that its position on the bonus was detailed in its Answer to Complaint in the 61 case.[2]

The Trial Examiner (now Administrative Law Judge) (ALJ) in the 61 case found that the bonuses were wages within the meaning of the Act and were therefore a subject of mandatory bargaining; that the decision to withhold the bonus was made and executed without giving the union an opportunity to bargain; and that Marland had failed to supply information needed to bargain intelligently. The board subsequently adopted the findings and conclusions of the ALJ.

The 23 action arose from two conversations between Joseph Marland, President of Marland One-Way Clutch Co., and John Russell, an employee of the company.

The first conversation occurred on July 15, 1971. Russell wanted to borrow $500.00 from profit-sharing funds. Marland explained that this was not possible but said he would personally lend him the money. Russell testified:

> "We discussed a few other little problems for awhile and then right before I was ready to leave he explained to me that if a certain person hadn't started the union over there, that maybe I wouldn't be short of funds. . . . And then he said to me that he thought if I were to start a letter, go around to some of the fellow's houses and talk to them about the amount of profit sharing that this man had, that it would be a nice idea if we were to ask him to share his profit sharing with the rest of us due to the fact that he was the cause of us loosing [sic] that money."

Russell also testified that Marland handed him a piece of paper which had the following notations on it:

---

1. The board had petitioned this court for enforcement, No. 72–1468, but the board subsequently moved to withdraw its application without prejudice, which motion was granted. The company takes the position that it had already complied at the time of the withdrawal; the general counsel states the withdrawal was based on the company's promise to comply. We are not able to find much of significance in this conflict.

2. The company's answer alleged, *inter alia,* that it "had paid a voluntary Christmas bonus to all employees both in and outside of the bargaining unit for the calendar years 1968 and 1969, such payment was made on a quarterly basis; that the total amount available for distribution of this Christmas bonus and the amount which each employee received varied among them said amounts being wholly within the discretion [of the company]; that there was no specified or specific formula nor any formal policy regarding eligibility."

It does not appear to be seriously contended that there was in fact any mathematical formula in existence. On the other hand, it appears that the union during negotiations had received from the company substantial information about the bonuses previously paid, including the fact that the payments averaged out among the shop employees at about 30¢ per hour.

27,000 Payroll loss
7,400 Stan Profit Share[3]

The ALJ found that the wages lost were probably a reference to a strike that had occurred. The ALJ found that Marland's remarks were no more than a contention that as· a result of unionization, employees went on strike and lost wages as a result and that this could not constitute a violation of § 8(a)(1) of the Act. The board disagreed, finding that the conversation constituted a violation because the reference to Stan created an impression of surveillance—the company knew he was the union organizer—and blamed him for financial loss.

The second conversation occurred August 9, 1971, when Russell, Marland, and their spouses went to the Russell residence after a religious retreat they had attended together. Russell testified that Marland stated during their conversation: "I'll promise you the men will never get their bonus and I'll sell the place before I settle." Marland denied he made that statement though he admitted he said he was disappointed that relations were not as harmonious as before and that he mentioned that he had received offers from several conglomerates to merge. The ALJ carefully analyzed this conflicting testimony, partially crediting Russell to the extent of being persuaded that Marland did speak to Russell about the bonus but not to the extent of being persuaded "that the facts as to exactly what was said has been presented by Russell."[4]

He concluded:

"Under such circumstances, I do not find the evidence to be reliable to establish that Marland was more than arguing that he would not settle the case and pay the bonus as a result of settlement. In effect it was a statement of the legal position he was taking in litigation. Such conduct is not violative of Section 8(a)(1) of the Act. I so conclude and find."

The board interpreted the conversation as a threat of plant closure which therefore violated the act.

Additionally, the 23 action complaint initially sought, according to the ALJ, an order directing the company to pay the employees for all bonus payments withheld that have accrued up to the decision. The ALJ dismissed this portion of the complaint on the grounds that as a matter of sound judicial administration of the Act, a complaint proceeding should not be utilized to effect a modification of a prior order of the board (the 61 order) or to determine compliance issues. The general counsel now concedes this was correct.

Later, the general counsel sought and obtained the modification of the 61 order which is now in issue. The modification changed the language in the affirmative action section of the order. The relevant section originally ordered the company to:

"Make whole the employees in the appropriate unit in 1970 for any loss they may have suffered of the third quarterly bonus payment in the manner set forth in the section of this Decision entitled 'The Remedy.' "

After modification the section read as follows:

"Make whole employees in the appropriate unit for any losses they may have suffered by reason of Respondent's unilateral withholding of any bonus payments, in the manner set forth in the section of the Administrative Law Judge's Decision entitled 'The Remedy.' "

## II. ORIGINAL 61 ORDER

The company argues that the original 61 order should be denied enforcement

---

**3.** At the hearing Stanley Terrutty testified that he was the union steward and organizer and that he was the only person in the shop named Stanley.

**4.** We have difficulty in reading the ALJ's determination as other than giving some credibility to Marland in denying the specific language Russell attributed to him.

on three grounds. First, it is contended that the bonus did not equate with "wages" within the meaning of the Act. Second, according to the company, the order is moot—the company has paid the third quarter bonus, it has bargained in good faith within the meaning of the Act, and it has supplied the union with information. Finally, with respect to the section of the order dealing with information, the company argues that enforcement would deprive it of due process because the failure to supply information was not charged in the complaint.

### A. Wages or Gratuity

██ It is clear that bonuses and fringe benefits may constitute wages within the meaning of the Act. *Beacon Journal Publishing Co. v. NLRB,* 401 F.2d 366, 367 (6th Cir. 1968); *NLRB v. Central Illinois Public Service Co.,* 324 F.2d 916, 918–19 (7th Cir. 1963). Upon the basis of the evidence as set forth hereinbefore, we have no difficulty in saying that there is a substantial basis in the record for the board's finding that the bonus payments were wages within the meaning of the Act.

### B. Mootness

██ Circumstances may arise where an enforcement proceeding will become moot because a party can establish that there is no reasonable expectation that a wrong will be repeated. *NLRB v. Raytheon Co.,* 398 U.S. 25, 27, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970), citing *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). More commonly, "[a] Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree." *NLRB v. Mexia Textile Mills,* 339 U.S. 563, 567, 70 S.Ct. 826, 829, 94 L.Ed. 1067 (1950).

██ It appears from the record that the payments of the third quarter bonus have been completed and that enforcement is not required of that portion of the order. Nevertheless, this is only a portion of the order. That the company must furnish the union with certain information is not a new concept. *Taylor Forge & Pipe Works v. NLRB,* 234 F.2d 227, 231 (7th Cir. 1956), *cert. denied,* 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238; *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Mallory & Co., Inc. v. NLRB,* 411 F.2d 948, 953 (7th Cir. 1969). The company does not argue to the contrary but rather argues that it has already supplied the information sought by the union and no further information is in existence.

Most, if not all, of the company's reliance upon mootness is founded upon the history of the bargaining and the information furnished during bargaining sessions. This evidence, if the company's version is correct in fact, would be pertinent and material in a compliance proceeding. The complaint in the 61 case, however, is concerned with the period following the union's certification and running to a time shortly after the first bargaining meeting in October 1970. Since the board has chosen to pursue enforcement of the 61 order after an earlier withdrawal of an application for enforcement, and being of the opinion that we cannot say that there was not substantial evidence to support the 61 order for the period it involved, we defer to the board's determination that there should be the imposition of a continuing obligation on the company. We decline to speculate that the likelihood of repeated conduct is so remote as to mandate disposition of the case on the ground of mootness. Clearly the company had more specific information about the payment of the bonus than that it was discretionary and not computed on a mathematical formula. The union was entitled to this information. Whether it received it at sometime subsequent to the order is, as we have observed above, a matter for compliance proceedings.

### C. Due Process

██ The company argues that enforcement of the board's order with re-

spect to disclosure of information would violate due process because this was not charged in the general counsel's complaint. The company relies on *NLRB v. Bradley Washfountain Co.,* 192 F.2d 144 (7th Cir. 1951). The general counsel argues that the refusal to bargain language in the complaint is sufficiently broad to include the refusal to supply information and in any event full litigation satisfies the requirements of due process. The board relies on *NLRB v. Duncan Machine Works, Inc.,* 435 F.2d 612, 615 (7th Cir. 1970), and *NLRB v. Scenic Sportswear,* 475 F.2d 1226 (6th Cir. 1973), among others. The board also argues that this issue is not properly before this court because the company did not file exceptions to the ALJ's findings on the issue. The company responds that the issue is before the court because the general counsel admitted compliance and that the ALJ limited the scope of the hearing to the extent that it cannot be said that there was a full hearing on the issue.

The position of the board must be upheld. As related in part I of this opinion, the company's response to the union's request for information was to refer the union to the company's Answer to Complaint. That the company included information on this issue in its answer shows it knew the matter was before the board. In addition, substantial evidence on the failure to supply information was adduced during the hearing. The limitations imposed by the ALJ did not prevent testimony on the issue but rather prevented introduction of evidence related to bargaining on other issues. In any event, the company makes no specific showing of how it was mislead by the actions of the board. If the company is relying on the general counsel's motion for dismissal of the original enforcement proceedings, its reliance is misplaced; any argument to the board would have had to occur before those proceedings were brought. This is not the type of extraordinary circumstance in which failure to raise objections before the board can be overlooked. See § 10(e) of the National Labor Relations Act.

## III. MODIFIED 61 ORDER

### A. *Power of the Board to Modify*

The company argues that the board had no power to modify its order because § 10(d) of the Act, which authorizes modification, only authorizes it "until the record in a case shall have been filed in a court." Under the company's reasoning the board lost the power to modify when the record was filed with this court in the original enforcement proceeding. The general counsel argues that the board regained jurisdiction to modify when we granted leave to dismiss the enforcement proceedings without prejudice and that the purpose of exclusive vesting of jurisdiction in the court—preventing conflicts of authority, *International Union of Mine, Mill and Smelter Workers, Locals 15, 17, 107, 108, and 111 v. Eagle-Picher Mining & Smelting Co.,* 325 U.S. 335, 342, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945)—would not be served by this interpretation because once the court dismissed the proceedings, the appellate court was without jurisdiction to enter orders. *People ex rel. Wait v. Bristow,* 391 Ill. 101, 62 N.E.2d 545 (1945). We agree with the general counsel's analysis and conclusions. *Ford Motor Co. v. NLRB,* 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221 (1939), cited by the company, is not in point. In that case a petition for review had been filed so that the board could not terminate the court's jurisdiction by ending enforcement proceedings. Here the company had filed no petition for review at the time of the withdrawal, and upon the granting of the motion to withdraw without prejudice, this court's jurisdiction terminated.

### B. *Enforcement of Modification Denied*

The effect of the modification is contested by the parties. The company argues that the board is improperly trying to dictate the substantive terms of a contract by requiring payment of bonuses. *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 490, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). The general counsel argues that the board is not trying to dictate substantive contract terms,

that it is only trying to clarify the original order, and that the modification makes no substantive change in the original order. This issue was explored extensively at oral argument; the parties are much closer to agreeing to the substantive requirements of the law than they are to agreeing on appropriate language to express it.

Substantively, the board's position, as stated during argument, is that if an employer gives notice of a proposed decrease in compensation, which presumably would include regularly given bonuses, and bargains in good faith on the issue thus created, then the employer's action in putting the decrease into effect is not unilateral action violating the Act. The general counsel offered a caveat to this as applied to the present case: the company must bargain as though the bonus was in effect, not as if it already had been eliminated; only in this manner, it was asserted, can the status quo ante be established as it existed before the initial unfair labor practice. The company agreed with the basic principle of notice and good faith bargaining as stated above but disagreed to the extent that the general counsel seemed to say that the bargaining must reach an impasse before the decrease could be put into effect.

■ The board disclaims that in modifying the section of the 61 order it was attempting to require the company to pay all bonus installments to date. However, if this was not the intent, we have difficulty in determining just why the board felt the necessity to make the modification.[5] The original order directed the payment of only the third quarter bonus. It further ordered that the company cease and desist from refusing to bargain and from unilaterally terminating bonus payments. The order also directed that the bargaining include the "Fourth quarter installment of the 1970 Christmas bonus, and any bonus installments," and to supply any information relevant and reasonably needed by the union in order for it to bargain intelligently on bonuses.

In our opinion, the original order needed no modification or clarification. If the company unilaterally terminated bonus payments under circumstances which would be in violation of the original order, and we will advert further to what those circumstances are, then the board can appropriately determine the matter in compliance proceedings. The determination of whether the company is obligated to make whole any employees for not receiving the bonus subsequent to the 1970 third quarter bonus was prematurely reached by the modification. If, as the board now states, it was not intended that the modification was to serve as an order that any particular quarterly bonus automatically should have been paid, then the modification was unnecessary. As it is stated, the modified section is too vague to inform the company what its obligations might be as to subsequent quarters.

Since we are enforcing the order in the 61 case as originally entered, we find it necessary to clarify the circumstances pertaining to the cease and desist order on unilateral terminations of the bonus payments. In enforcing that part of the order, we do so on the construction that it does not prohibit a termination of bonus payments under circumstances in which the company has given notice of discontinuance to the union and has bargained in good faith on the matter of

---

5. In July 1972, in case 23, the ALJ observed in his decision that the general counsel was seeking an order directing the company to pay the unit employees for all bonus payments withheld that have accrued up to the decision and recommended order in case 23. In his decision, the ALJ stated that he was "persuaded that as a matter of sound judicial administration of the Act, this complaint proceeding should not be utilized as a vehicle to in effect modify the Board's Order in Case 13–CA–10161 and to determine compliance issues in such proceeding." As indicated in the present opinion, we agree with the principle and extend the principle to say that the matter of whether there was compliance should be determined in proceedings for that purpose and not by virtue of modification of the original order in which the issue was not considered.

discontinuance. As the order was originally written, it might appear overly broad because it is likely that under the circumstances outlined a discontinuance would be unilateral in the sense that it would not be bilateral, i. e., agreed upon by the company and the union. We construe the cease and desist order more narrowly, as apparently does the board. The only area of disagreement appears to be whether the bargaining must be to an impasse before the company can unilaterally terminate.[6]

The board cites respectable authority from this circuit and elsewhere to the effect that employers may not without violating § 8(a)(5) and (1) unilaterally take action on a mandatory subject of bargaining, such as wages, unless a genuine impasse, not caused by the failure of one of the parties to bargain in good faith, has been reached. For example, *United Fire Proof Warehouse Co. v. NLRB,* 356 F.2d 494, 497 (7th Cir. 1966); *NLRB v. Palomar Corp.,* 465 F.2d 731, 735 (5th Cir. 1972); *NLRB v. U. S. Sonics Corp.,* 312 F.2d 610, 615 (1st Cir. 1963); and *NLRB v. Fitzgerald Mills Corp.,* 313 F.2d 260, 268 (2d Cir. 1963), *cert. denied,* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64.

The company counters with authorities which support the position that, if, during the course of bargaining, notice has been given of proposed unilateral action and the union has been afforded a reasonable opportunity to bargain concerning the proposed change, the company may then lawfully take the proposed action. For example, *NLRB v. United Nuclear Corp.,* 381 F.2d 972, 976 (10th Cir. 1967); *NLRB v. Cone Mills Corp.,* 373 F.2d 595 (4th Cir. 1967); *Lane v. NLRB,* 135 U.S.App.D.C. 372, 418 F.2d 1208 (1969).

The issue before us, however, does not require the resolution presented in this area of disagreement between the parties. That resolution no doubt will be appropriate in a compliance proceedings if it is determined that such is necessary. In the 23 case, as we have previously noted, the board agreed with the ALJ that a complaint proceeding should not be utilized to determine compliance issues. Yet more than a year later by purporting to modify the original 61 order, the board, it appears to us, has done exactly that, i. e., determined that the company in the intervening years has not complied with the 61 order. Unless the company is locked-in to a perpetual payment of bonuses, irrespective of the extent of or the good faith of bargaining, which we do not understand the board to be contending, the resolution of the question of compliance with the 61 order should be determined on the basis of the history of the bargaining as developed in an appropriate due process hearing and not by the administrative modification here attempted. We therefore in the present proceeding are denying enforcement of the make-whole modification order of January 9, 1974.

## IV. THE 23 ORDER

The company does not argue that surveillance, creating the impression of surveillance, or coercion is lawful; but rather it argues that there was not sufficient evidence in the record to find these violations. We agree.

In their briefs the parties dispute the standard of review for the conclusions of the board. We had occasion to consider the proper standard in *NLRB v. Wisconsin Aluminum Foundry Co.,* 440 F.2d 393 (7th Cir. 1971):

"The standard which this court must follow in reviewing the Board's order is whether on the record as a whole there is substantial evidence to support its findings; the meaning of 'on

---

6. The board's caveat set forth above is not quite clear to us. If the company gives notice of termination, it is difficult to see how it could continue to bargain as though the bonus was in effect. What is required is that it bargain in good faith. On the other hand, while the company has contended in the present cases that the bonuses were voluntary and discretionary, we fail to see how it could claim that the bonuses were not in effect prior to the union coming on the scene.

the record as a whole' encompasses not only testimony of witnesses and the Board's findings and conclusions but also the report of the trial examiner. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court may not displace the Board's choice between two fairly conflicting views even though we might justifiably have made a different choice had the matter been before us *de novo*. *Universal Camera Corp., supra* at 488, 71 S.Ct. 456, quoted in NLRB v. Walton Manuf. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). However, we are not barred from setting aside a Board decision when we cannot 'conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.' Universal Camera Corp., *supra*." 440 F.2d at 398.

A special problem arises when the ALJ and the board disagree. In *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Supreme Court held that the substantial evidence test is not modified when the court and the ALJ disagree but that the ALJ's decision should be given the support it intrinsically commands and that this largely depends on the importance of credibility in a particular case. 340 U.S. at 495–96, 71 S.Ct. 456. Of necessity in a case such as this, the right of the employer to speak must be balanced against the rights of the employees under the National Labor Relations Act to organize. Recognizing the sensitivity of employees to rumors of plant closings, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 619–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the company is nevertheless entitled to express its opinions in friendly conversations so long as its statements do not contain implied threats. See *Lake City Foundry Co. v. NLRB*, 432 F.2d 1162 (7th Cir. 1970).

■ To establish surveillance or to create the impression of surveillance as unfair practices requires more than showing that the employer knows who started the union. None of the cases cited by the general counsel establish the contrary; each involved patterns of interrogation or threats to use knowledge. *NLRB v. Merchants Police Inc.*, 313 F.2d 310, 311–12 (7th Cir. 1963) (statement that employer knew who was at union meetings coupled with a statement that "some" might lose jobs constituted coercion); *NLRB v. Drives, Inc.*, 440 F.2d 354 (7th Cir. 1971), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (interrogation and statement that employer knew who union members were and they were going to get fired eventually); *NLRB v. Brown Specialty Co.*, 436 F.2d 372, 374 (7th Cir. 1971) (repeated questioning and statement that a supervisor knew who started the union business and that things were going to change); *NLRB v. Borden Co.*, 392 F.2d 412 (5th Cir. 1968) (interrogation, home visits, speeches declaring knowledge of union activities and that employees would suffer); *Trumbull Asphalt Co. v. NLRB*, 314 F.2d 382 (7th Cir. 1963), *cert. denied*, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (interrogation, encouraging spying).

■ There is no question but that on the date of the July 15, 1971, conversation between Marland and Russell the former was aware of the identity of the employee who had been the principal organizer in the union's effort to achieve representation status.[7] We find no basis, however, in the findings of the ALJ for

---

7. The ALJ's findings, supported by substantial evidence, showed that Marland (1) indicated to Russell that the activities of the employee-organizer (Stanley Terrutty; see note 3 *supra*) in starting the union may have caused Russell's need for a loan, and (2) that Mr. Marland informed Russell of the substantial sum in the organizer's profit-sharing account and suggested that Russell "go around to some of the fellow's houses and talk to them about the amount of profit sharing this man had, that it would be a nice idea if we were to ask him to share his profit sharing with the rest of us due to the fact that he was the cause of us loosing [sic] that money."

the inference that the knowledge of identity was acquired by surveillance nor that it would have created the impression in the mind of Russell that there had been surveillance.

The conversation in question occurred some 10 months after the union had been certified. This was not a case involving claimed surveillance during the course of an organizational drive. Russell's testimony indicated no surprise that Marland was aware of Stan's organizational efforts. The testimony indicated nothing more than that Russell matter-of-factly knew that Terrutty was the organizer. Indeed, Terrutty, himself, took the stand in the same hearing at which Russell testified and said he "organized the plant . . . and was elected as a steward of Lodge 113."

The transcript of the 61 hearing, held on February 18, 1971, (approximately 5 months prior to the Russell-Marland conversation) established through the testimony of the union's business agent that at the October 2, 1970, negotiation meeting (the first bargaining session) Terrutty was one of the two key men representing the union. There is no reason for believing that Terrutty did not continue to participate in subsequent negotiating sessions.

At the 61 hearing in February 1971, the general counsel introduced as exhibits copies of correspondence about the bonus which had been sent to employees during the latter part of 1970. The exhibits were those which had been sent to and received by Terrutty. It clearly was no secret by mid-1971 that the number one person in the local union was Stanley Terrutty.

Neither this court nor the board should ignore the realities of the world in which we live. It is beyond comprehension that in a plant of some 30 employees everyone connected with the factory would not have been aware of who

had engaged in organizing the employees nearly a year earlier without the necessity of any resort to illegal spying. The mere fact that the company president indicated knowledge of the identity of the moving spirit in the organizing effort is too exiguous a membrane to bear the weight of the inference the board has fastened to it. We hold, therefore, that the board's order without regard to surveillance is not supported by substantial evidence and enforcement must be denied.

■ The board's finding of coercion is based on a teatime conversation between Marland and Russell in the latter's home following their joint attendance at a religious activity. In our opinion, the board's order based upon its conclusion of law that the company had threatened the employees with plant closure is not in the context in which the board is free to exercise its expertise in drawing inferences diverse from those drawn by the ALJ. The board obviously was taking the position that the statement Russell said Marland made to him was gospel. This ignores completely a part of the credibility determination by the ALJ.[8] After hearing the witnesses— Russell testifying that Marland used specific language regarding selling the place before he would *settle* and Marland, who did not deny talking about bonuses, not recalling any discussion on that subject but testifying that there had been conversation in which he had referred to offers to purchase the company—the ALJ credited Russell's testimony, which after all had not been specifically denied, that bonuses had been discussed. The ALJ, however, did not give the credibility gloss to the words as Russell remembered them, and it is obvious from the record that he credited Marland's testimony of the context in which the matter of bonuses were discussed. The inferences to be drawn by the board must not

8. We, of course, do not intend to indicate that the board may never base its decision on testimony which the ALJ did not credit. In *Universal Camera Corp. v. NLRB, supra,* the Court stated: "We do not require that the ex-

aminer's findings be given more weight than in reason and in the light of judicial experience they deserve." 340 U.S. at 496, 71 S.Ct. at 169.

be unreasonable, *Weyerhaeuser Co. v. NLRB,* 311 F.2d 19, 22 (7th Cir. 1962), which in our opinion means, *inter alia,* that the inference should not be based upon evidence of the inconclusive, weak nature of that in the present case, particularly where the inference ignores completely a part of the credibility determination of the ALJ. As with the first prong of the board's decision in the 23 case, we declined to enforce because of lack of support by substantial evidence.

In accordance with the foregoing opinion, enforcement is ordered in the 61 case as originally entered, enforcement is denied in that case of the order as modified on January 9, 1974, and enforcement is denied in the 23 case.