**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COLONIAL HAVEN NURSING HOME, INC., Respondent.**

No. 75–1864.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1976.

Decided Sept. 15, 1976.

Rehearing Denied Oct. 22, 1976.

Elliott Moore, Robert A. Giannasi, Andrew F. Tranovich, NLRB, Washington, D.C., for petitioner.

Elton L. French, St. Louis, Mo., for respondent.

Before PELL and SPRECHER, Circuit Judges, and JAMESON, Senior District Judge.*

PELL, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order issued June 30, 1975, against Colonial Haven Nursing Home, Inc. (Home). The Board's Decision and Order are reported at 218 NLRB No. 137. The principal issue is whether substantial evidence on the record as a whole supports the Board's findings that the Home committed unfair labor practices.

## I. Factual Background

The Home is engaged in the operation of a proprietary, professional care nursing home in Granite City, Illinois. In October 1973 the Home hired some employees and opened the facility for business. On February 5, 1974, James Potterton, Union Field Representative for Service and Hospital Employees, Local No. 50 of the Service Employees International Union, AFL–CIO (the Union), visited the Home and began distributing union literature to the employees. He was told that he should leave the premises. Thereafter, the Union continued organizational efforts and received signed Union authorization cards from 23 out of the approximately 50 employees employed at the Home prior to March 5, when it filed a representation petition with the Board. At about noon of the following day, Home received a copy of the Union's representation petition. This representation petition was dismissed by the Regional Director on April 23, 1974, essentially upon the basis that the present employee complement was not representative of that which would be employed in the future inasmuch as Home planned to establish more job classifications and to hire more employees.

During the period between the filing and the dismissal of the representation petition, Home Administrator Jerry Walter spoke to several employees about job evaluations and raises. While the specific rulings of the Administrative Law Judge (ALJ) and the Board will be developed in greater detail hereinafter, we note at this point by way of background that most of these conversations with some six employees occurred shortly after the receipt of the rep-

* Senior District Judge William J. Jameson of the District of Montana is sitting by designation.

resentation petition at the home, that the ALJ found the interrogation violative of Section 8(a)(1) of the Act but found no impropriety in the wage increases and no improper implication of future wage increases. The Board affirmed these holdings except with regard to a wage increase to one employee only and implied wage increases. The issue of principal importance in the present proceeding is the status of the rights of discharged employees following a strike occurring subsequent to the dismissal by the Regional Director of the representation petition. The discharges were the basis of a second unfair labor practice charge, which has been consolidated with the first set of alleged unfair labor practices, being those which occurred prior to the dismissal of the representation proceeding.

While it appears to us that the first set of unfair labor practices are on the whole extremely mild and of a technical nature which could scarcely have had any real effect in a representation election, or in influencing employees in the exercise of their statutory rights, they do assume a place of significance as a fulcrum for the second set of charges. Because of their importance in this respect, we set forth the facts regarding the earlier claimed unfair labor practices in greater detail than we would ordinarily. If they were all that was involved in the case, we no doubt, accepting the expertise of the Board, would have given brief treatment to them notwithstanding any feeling that we might have had that they were arguably of insufficient importance to bring into play Board procedures.

Home Administrator Walter asked employee Bridick on March 6, 1974, if she had heard anything about the Union. After receiving a negative reply, he began discussing the disadvantages of a union and gave her a paycheck which he indicated would reflect a ten cent per hour pay increase. Later that evening, during a job evaluation interview with employee Barry, Walter asked if she had been approached by any Union people. Barry replied that she had not. As she was leaving, Walter told her that she would receive a nickel raise.

Still later that evening or early March 7, 1974, in an evaluation interview with employee Pierson, Walter asked her if she had seen a petition going around the nursing home. When Pierson responded negatively, Walter then told her that he had been an administrator of thirteen nursing homes, that none of them had a union, and they got along quite well without a union. He stated that he was a "nickel and dime man"[1] and would rather give the employees a raise when he thought that they really needed it rather than to spend it out every three or six months. He also stated that he had been an administrator at a nursing home where the nurse's aides could get as high as $2.85 an hour but which was non-union. As Pierson left, Walter told her that she would be getting a dime raise.

On March 7, Walter spoke to employee Willaredt about her job evaluation and told her she would be getting a nickel raise. Walter then began discussing the Union and asked her if she had heard about a Union petition. When she replied that she had not, he began discussing the disadvantages of a union, noting specifically that at some homes where he had worked, girls who worked at it could make good wages like between $2.85 and $3.00 an hour.

Also on March 7, Home President Robert Swiatek visited employee Gregory at the local hospital and asked her if the Union had bothered her. When she replied in the negative, Swiatek said that was fine because "there was something about a union going on." During the latter part of March, Swiatek had another conversation

1. The statement that he was a "nickel and dime man" would appear to be illustrative of the fact that the company's anti-union campaign, if it was such, had few aspects either of egregiousness or persuasiveness. While the wage scale in this establishment does not appear to have been at a high level, the granting of a five or a ten cent increase or the *implied* promise to do so at some unspecified future date would scarcely seem to be the type of conduct which would arouse a fervent desire to vote against union representation. Conversely, it might seem to provide an excellent platform for union propaganda.

with Gregory about the Union. After he noted that both of them were "pretty good friends," he told her that if she heard anything about the Union, she was to let him know.

Approximately a month later, on April 24, 1974, Walter asked employee Lieneman whether she had been informed about her raise. He also asked her why the employees wanted a union in the home. When she said that a union might be able to secure sick benefits, Walter told her that Home paid some sick benefits, citing two examples, and also explained that with a union Home might be unable to terminate unsatisfactory workers. In the early morning of April 27, 1974, Administrator Walter approached employee Pierson as she was preparing to clock out for the day and told her that she would be getting a twenty-five cent an hour increase for being in charge. He then instructed her to write on her time card the number of days she had been in charge so that she would be paid at the new rate. About three minutes later, Director of Nursing Skube informed Pierson for the first time that she was "in charge." [2]

The Union received the Decision and Order of the Regional Director dismissing the Union's representation petition on April 24, 1974. On that and the following day, the Union held meetings with Home employees to discuss what action should be taken in the future. After informing the employees that the petition had been dismissed, Union Representative Potterton outlined three possible alternatives to meet the situation: filing of a new petition, appeal of the dismissal decision, or filing unfair labor practice charges based upon unfair labor practices allegedly committed by Home during the seven-week organizational campaign.

At the meetings on April 25, Potterton discussed with the employees the mechanics of a strike, told them that they would have to vote on whether to strike Home, and read them a draft letter he proposed to give to Home. This letter accused Home of engaging in unfair labor practices and of repeatedly refusing to recognize the rights of its employees. The letter also warned that unless action in good faith were taken to settle the charges by Saturday, April 27 at 6:30 a. m., a strike would ensue. Potterton also advised the employees that if they went "out on strike because of the unfair labor practices, that the company had committed, that they could not be replaced."

The employees present at the meetings on April 25 voted to strike Home if it did not respond to Potterton's letter by 6:30 a. m. on April 27. Also on April 25, Potterton filed unfair labor practice charges alleging violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), against Home with the Board's Regional Office in St. Louis, Missouri. On the following day, he delivered the letter and a copy of the alleged unfair labor practice charges to Home. Home making no response to the Union's letter, approximately thirty-seven employees struck at the designated time and continued on strike until May 31, 1974.

During the first two days of the strike, both President Swiatek and Mr. Will McCain, executive vice president of Nursing Home Managers, Inc., the company managing the operations of Home, photographed employees carrying picket signs in front of the home and also attempted to use an inoperative movie camera for the same purpose. The picture taking, according to testimony at the hearing, was pursuant to advice of counsel although the motivation or reason for the advice was not developed. Here Home argues that the question of what picketing is proper and what is improper is frequently a question of litigation and that the purpose of the photography was for possible use as evidence. The

---

2. The ALJ found it was clear that the evidence was insufficient to reveal that the 25 cent raise to Pierson was given in order to discourage said employee's Union activities. The Board disagreed. This was the only wage increase found by either the ALJ or the Board to be an unfair labor practice. It is also to be noted that this occurred at approximately the time the picket line was first assembling. It therefore was not one of the claimed unfair labor practices referred to in the Union's letter of April 26 in which Home was given less than 24 hours to settle. if a strike was to be averted.

record does not indicate any untoward picketing incidents.

Some of the picket signs displayed during the thirty-five day strike stated "COLONIAL HAVEN UNFAIR—SERVICE AND HOSPITAL EMPLOYEES UNION, LOCAL 50" and "COLONIAL HAVEN ON STRIKE, SERVICE AND HOSPITAL EMPLOYEES UNION, LOCAL 50 AFL–CIO." Other picket signs stated "A UNION WILL MEAN BETTER PATIENT CARE," and "$1.60 IS A MEDIEVAL WAGE." A handbill was also distributed to visitors and relatives of patients asking that patients be moved to other homes, a long list on the handbill specifying where the Union thought the patients should be sent. On the other side of the handbill, it was stated that the employer had refused to recognize the Union, that Home was understaffed, and that employees were only paid the minimum wage.

On May 31, the Union sent and the Home received a letter indicating that the striking employees were unconditionally offering to return to work and that they would report to work at their regular starting times on Monday, June 3, 1974. When the striking employees reported for work, they were informed that they had been replaced and that they would have to make new applications for employment.

## II. Administrative Proceedings

On the day when the striking employees were not allowed to report back to work, the Union filed an unfair labor practice charge claiming that Home had discriminated against its employees in regard to terms and conditions of employment by refusing to reinstate them after they had made an unconditional offer to return to work from an unfair labor practice strike. Subsequently, as we have previously noted, the case arising from this charge was consolidated with that arising out of the charges filed on April 25. Upon the facts set forth above, the ALJ found and concluded that the Home had violated § 8(a)(1) of the Act by questioning employees, Barry, Pierson, Willaredt, Gregory, and Lieneman in a manner constituting interference, restraint, and coercion within the meaning of the Act. The ALJ found and concluded that the evidence was insufficient to warrant an inference that the wage increases were given or promised in order to discourage employee union activity, and he recommended that the allegations of unlawful conduct in such regard be dismissed.

The ALJ in his decision treated the matters of the payment of wage increases and of the implied promises separately. With regard to the first aspect of the matter, the decision noted that the company had plans to evaluate employee job performance and to grant wage increases where warranted within 3 to 6 months after employment and previous evaluations, which had been made known to most employees at time of hiring, and that the job evaluations were made in February prior to knowledge of the organizational drive at which time the wage increases had been determined. The ALJ concluded that the timing of the Union's representation drive had no bearing on the job evaluations and wage increases granted. The Board affirmed the finding and ruling as to the wage increases granted in early March.[3] The ALJ also found the record did not support the General Counsel's position that the March 6th conferences with Walter constituted implied promises of wage increases if the employees would abandon the Union. Because of the rationale upon which he had found the granting of the March wage increases proper, i. e., that the action was planned and carried out without regard to the organizational drive, which rationale the Board apparently accepted, the ALJ likewise found no improper implication of wage increases in exchange for abandonment of the Union. The Board, however, with regard to future wage increases found that Walter was clearly attempting to impress upon employees Pierson, Willaredt, and Bridick that they would

---

**3.** The Board found the wage increase to Pierson which was given at the time the strike commenced was an unfair labor practice, but as previously indicated this event was not involved in the calling of the strike by the Union.

get wage increases in the future without the assistance of the Union. We have some difficulty in following the Board's reasoning on this point inasmuch as the core of the ALJ's approach was that the preexisting evaluation plan would have accomplished future wage increases when warranted and such plan was not motivated or made effective by virtue of the Union drive.

The ALJ concluded that the striking activity of the employees constituted unprotected activity. Upon considering all of the facts, the ALJ was persuaded that the strike was not an unfair labor practice strike, and that the overriding reason for the strike was for an unlawful purpose, *viz.,* the obtaining of recognition by the Union as an exclusive bargaining agent in a bargaining unit which the Regional Director had determined to be a non-representative complement. The ALJ concluded that the overwhelming weight of the facts revealed that the Union and the employees were motivated in having a strike as a means of putting pressure on Home to recognize immediately and voluntarily the Union as bargaining agent rather than waiting until the proper time for an election or recognition.

Based upon his conclusion that the strike clearly was for an unlawful purpose and that the employees' striking activity was not protected, the ALJ concluded that the taking of pictures or purported taking of pictures of the strikers did not constitute conduct violative of § 8(a)(1) of the Act. Similarly, the ALJ concluded that Home had no obligation to reinstate the employees on the basis of rights as unfair labor strikers or even as economic strikers, and he concluded and found that Home's failure to reinstate the employees upon their unconditional offer to work did not constitute conduct violative of §§ 8(a)(1) and (3) of the Act.

The counsel for the General Counsel timely filed exceptions to the ALJ's Decision, together with a supporting brief. Home filed a document labelled as a Brief to the Board in Support of Cross-Exceptions to the Exceptions of the General Counsel.[4] Although it is questionable that this document complied exactly with applicable Board Rules and Regulations specifically dealing with cross-exceptions, the answering brief did place before the Board the major contentions of the parties.[5] Upon its consideration of the record in the light of the parties' exceptions and briefs, the Board made additional and contrary findings.

Specifically, the Board found that Home had violated § 8(a)(1) of the Act by coercively questioning employee Bridick about her knowledge of union activity.[6] Also, as

---

4. An analysis of the document reveals that it poses five questions as presented by the thirteen exceptions filed by the General Counsel. Although the document clearly qualifies as an answering brief under 29 C.F.R. §§ 102.45(b), 102.46(b), (c), (d), and (j), and 102.48(b) and (c), it is difficult to characterize the document as one complying with 29 C.F.R. § 102.46(e). In sum, the document is clearly an answering brief but only arguably a specification of cross-exceptions joined with a supporting brief. Had not the Board's Decision and Order specifically noted that "Respondent [Home] has excepted to certain credibility findings made by the Administrative Law Judge," see 218 NLRB at 1 n. 2, this court would have great difficulty in concluding that Home has sufficiently complied with § 102.46(e) so as to overcome the waiver provisions articulated in § 10(e), 29 U.S.C. § 160(e), as to some of the important issues presented in this case.

5. 29 C.F.R. § 102.48(b) provides:

Upon the filing of timely and proper exceptions, and any cross-exceptions, *or answering briefs,* as provided in § 102.46, the Board may decide the matter forthwith upon the record, or after oral argument, or may reopen the record and receive further evidence before a member of the Board or other Board agent or agency, or may make other disposition of the case. [Emphasis supplied.]

29 C.F.R. § 102.48(c) provides:

Where exception is taken to a factual finding of the administrative law judge, the Board, in determining whether the finding is contrary to a preponderance of the evidence, may limit its consideration to such portions of the record as are specified in the exceptions, the supporting brief, *and the answering brief.* [Emphasis supplied.]

6. The ALJ's decision did not address the matter of Walter's conversation with Bridick. The Board, quite correctly in our opinion, treated this as an inadvertent oversight and concluded that the ALJ would have arrived at the same

previously noted herein, the Board found that Walter was clearly attempting to impress upon employees Pierson, Willaredt, and Bridick that they could get wage increases in the future without the assistance of the Union. Accordingly, it found that such implied promises of future wage increases had as their object to dissuade employees from continuing their support for the Union and interfered with the exercise of § 7 rights in violation of § 8(a)(1).

The Board disagreed with the ALJ's conclusion that there was insufficient evidence that the twenty-five cents per hour raise given employee Pierson was given to discourage the employees' union activities. Upon a review of the evidence, the Board found that the 25-cent-an-hour increase was an attempt to encourage Pierson to abandon the Union and not to join in the strike commencing that very morning. It found another violation of § 8(a)(1) of the Act in Home's grant of this pay raise.

The Board found, contrary to the ALJ, that the employees' strike and picketing were motivated in substantial part by Home's unfair labor practices and that the employees did not lose their status as unfair labor practice strikers with the attendant right to prompt reinstatement upon their unconditional offer to return to work because an object of the strike may also have been to obtain recognition or an expedited election. Noting that the ALJ had not specifically made a finding as to whether Home's unfair labor practices contributed to the employees' decision to strike, the Board thought it unnecessary to determine which concerns predominated in the employees' minds in determining to strike because the Board could find, as it did, that on the facts detailed above Home's unfair labor practices clearly contributed to the employees' desire of taking the concerted action of engaging in a strike.

The Board's finding as to the causal role of Home's unfair labor practices in motivating the strike led to the finding that the strikers were unfair labor practice strikers. The Board recognized that, as such, they would be entitled to automatic reinstatement upon their offer to return to work unless, as found by the ALJ, they were to be deemed to have lost this privileged status, and even their protected "employee" status under the Act, because other objects or purposes sought to be promoted by the strike were unlawful or contrary to the policies of the Act. The Board concluded that the employees' strike had not lost its status as an unfair labor practice strike and that the employees were entitled to the protection of the Act.

In reaching this conclusion, the Board first analyzed the policy implications of its "expanding unit principles." It noted that the Board would not authorize the use of its resources to conduct an election where there was evidence that in the near future the number of employees in the sought-after unit and the number of classifications filled would substantially increase. Suggesting that this policy was designed to preserve the right of participation in choosing a representative, or not to be represented, to as many employees as possible so as not to "lock in" for the term of contracts up to three years in duration a group of non-consenting employees disproportionately larger than that which initially made the choice between representation and no representation, the Board further noted that the policy behind its expanding unit principles was never intended to preclude an employer and employees from entering into an agreement providing for terms and conditions of employment until such time as a petition had been filed for the expanded unit.

The Board then turned its attention to the role of § 8(b)(7)(C) of the Act. Noting that the record established that the employees had struck and picketed for approximately a week longer than the 30-day maximum grace period provided in that section

result insofar as interrogation of Bridick was concerned as he had with regard to the other employees to whom Walter talked in early March. That result as to the other employees, as we have previously noted, was affirmed by the Board.

for filing a petition, the Board suggested that no § 8(b)(7)(C) charge had ever been filed in the case, nor had issues relating to the statutory section been sufficiently litigated in the present proceeding to make any findings thereon.[7] Assuming arguendo that the picketing was motivated in part by a recognitional object and that the extended picketing may have been found to have violated the Act if it had been charged and litigated, the Board nevertheless found the Union's picketing of Home's premises for over thirty days did not seriously contravene the policies of the Act under the circumstances of the case.

The Board found, contrary to the ALJ, that Home's picture taking created the appearance of coercive surveillance for purposes of future reprisals and, as such, violated § 8(a)(1) of the Act. Since it did not consider the assumed unlawful picketing of the Union as more than a technical violation, one which did not outweigh what the Board apparently considered serious unfair labor practices by Home, it further found that Home's refusal to allow the strikers to return to work violated §§ 8(a)(1) and (3) of the Act.

The Board modified the ALJ's recommended remedy by including an order that Home reinstate the discharged employees and make them whole by an award of backpay. Home challenges the Board's order.

### III. The Unfair Labor Practices

#### A. Coercive Interrogation

■ Section 8(a)(1) of the Act proscribes employer conduct which coerces employees in the exercise of their right to form, join, or assist labor organizations. Before the Board, Home did not contest the findings or conclusion of the ALJ that Home's interrogation of employees Barry, Pierson, Willaredt, Lieneman, and Gregory violated that section. Under § 10(e) of the Act, 29 U.S.C. § 160(e),[8] Home's failure to object to these findings precludes review in this court. Home has shown no extraordinary circumstances excusing its failure to challenge the findings to the Board. *See Kesner v. National Labor Relations Board,* 532 F.2d 1169, 1172 (7th Cir. 1976). In these circumstances, the Board is entitled to summary enforcement of this part of the order.

■ It is still open to Home to challenge the finding that it coercively interrogated employee Bridick. However, it is well established that the Board may properly find a § 8(a)(1) violation if, within the context of the interrogation, the questions asked appear to have had a coercive effect on the employees. *NLRB v. Townhouse T.V. & Appliances, Inc.,* 531 F.2d 826, 828 (7th Cir. 1976). We cannot say that substantial evidence on the record as a whole does not support the Board's finding that Walter's questioning of Bridick about her

7. We note that in its Brief to the Board in Support of Exceptions to the ALJ's Decision, counsel for the General Counsel brought to the Board's attention that the ALJ had not specifically discussed the application of § 8(b)(7)(C) to a 35-day strike without a petition being filed. Counsel for the General Counsel thereupon argued that the § 8(b)(7)(C) misconduct of the picketing employees should not preclude a remedy of reinstatement and backpay under the circumstances presented in the case. Counsel for Home argued in its brief that injection of the § 8(b)(7)(C) issue came too late inasmuch as there was nothing in the record on the subject and the General Counsel had not raised the issue in its post-hearing brief. After noting its objection to the inclusion of the § 8(b)(7)(C) issue and argument, Home's counsel did present argument on the question.

Because of the disposition we reach, we need not at this time consider whether the company would be precluded from now relying on a § 8(b)(7)(C) violation in supporting the refusal to reinstate when it had not filed an unfair labor practice charge based upon such violation or the further question whether the company could successfully rely upon such a violation in view of the minimal five day excessive picketing when balanced with the activities of the company. Although these would be the two principal issues which might arise out of the § 8(b)(7)(C) matter, there are other tangential aspects which might not be easy of resolution.

8. Section 10(e), 29 U.S.C. § 160(e), provides in part:

No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

knowledge of union activity was coercive notwithstanding the reservations we have in discerning much of a coercive nature in the conversational activity here involved.

### B. *Improper Wage Increases*

■ Section 8(a)(1) prohibits "not only intrusive threats and promises, but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *NLRB v. Exchange Parts, Inc.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). The determination of whether the granting of benefits stems from lawful economic motives or is intended to discourage employee interest in organization is the kind of inference which is primarily for the Board. *The Conolon Corp. v. NLRB*, 431 F.2d 324, 327 (9th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971).

In this case, the ALJ found insufficient evidence to warrant an inference that Home had improperly given raises or impliedly promised future wage increases. The Board reviewed the record and made a contrary finding as to future increases and the increase to Pierson. The question on this review is not whether we would have interpreted the employer's intention as did the Board in the first instance but whether the Board's resolution of this factual issue is supported by substantial evidence on the record considered as a whole. *NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697, 703 (7th Cir. 1974).

■ In this case, there is evidence supporting the ALJ's conclusion that Home's wage increases were given pursuant to an established policy of the employer. The finding that the increases other than to Pierson were given for legitimate business purposes was affirmed by the Board. On the other hand, Walter's statements about his wage policies arguably would allow an inference that he was attempting to impress upon the employees that they could get wage increases in the future without the assistance of the Union. Implied promises of future wage increases have a tendency to discourage employees from joining a union or engaging in union activities. This court has indicated that the timing of wage increases or other benefits unilaterally conferred is a significant factor in § 8(a)(1) cases. *Gruber, supra* at 700–02. Although we think that this case, like *Gruber*, is a close one, our limited scope of review under the substantial evidence rule requires us to uphold that part of the Board's decision and order which found that by granting the increase to Pierson and by impliedly promising future increases to other employees Home thereby violated § 8(a)(1) and which order required Home to cease and desist from such conduct in the future.

### C. *Unlawful Surveillance*

Home admits that President Swiatek, following the advice of his attorney, took pictures of the employees who were picketing and of the language appearing on their picket signs. It argues that there was no evidence of any intimidating or coercive statements being made to the employees while the pictures were being taken. It argues further that, since the language appearing on picket signs is often necessary evidence in Board or court proceedings, the Board's finding of a § 8(a)(1) violation effectually precludes an employer from obtaining accurate and reliable evidence in what is often the fastest and most efficient manner. The Board argues that an employer has no right to take pictures of peaceful picketing of his premises in a lawful strike engaged in by his employees absent a showing of justification or valid explanation for his actions. It contends that anticipatory photographing of peaceful picketing in the event something might happen does not justify an employer's conduct when balanced against the tendency of that conduct to interfere with the employees' right to engage in concerted activity. The Board suggests that it could reasonably find that the photographing or the appearance of photographing strikers during the

first two days of the strike served no legitimate purpose and was reasonably calculated to coerce and restrain the striking employees by creating a fear among them that the record of their concerted activities might be used for some future reprisals.

The decided cases tend to support the position adopted by the Board. We turn to an analysis of the major cases cited to this court.

The Board has squarely held that anticipatory photographing of peaceful picketing in the event something might happen does not justify an employer's conduct. *Flambeau Plastics Corp.*, 167 NLRB 735, 743 (1967). When the Flambeau Corporation sought review of the Board's order in this court, we noted that the vice-president took moving pictures every day for at least two months, invariably taking pictures of newcomers to the picket line as well as pictures of the strikers' automobiles and their car licenses. *Flambeau Plastics Corp. v. NLRB*, 401 F.2d 128, 132 (7th Cir. 1968), *cert. denied*, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). Since there were a number of serious violations by the company, this court found it unnecessary to elaborate or to discuss what it characterized as routine questions arising from the § 8(a)(1) violations found by the Board. Our conclusion that the Board's findings were supported by substantial evidence was therefore not buttressed by any lengthy analysis of the law of improper surveillance.

Other decided cases, however, have both set down a standard and developed a supporting rationale. In *NLRB v. Associated Naval Architects, Inc.*, 355 F.2d 788, 791 (4th Cir. 1966), the court made clear that evidence of actually coercive statements was not necessary. In that case, the company's president had ordered pictures taken of union handbillers. The court ruled that the photographing was a plain violation of the Act, whether or not it was coercive in actual fact. This decision plainly supports the Board's position that it is the *tendency to interfere or coerce* which is determinative. Home's argument that no § 8(a)(1) violation should be found unless there is independent evidence to show that the taking of the pictures was done in such a way as to intimidate or coerce the employees, *viz.*, making intimidating statements to the picketers, would require this court to adopt a standard of actual rather than possible coercion. *Associated Naval Architects* suggests the impropriety of such a standard, and we decline the invitation to adopt it.

We conclude that the Board may properly require a company to provide a solid justification for its resort to anticipatory photographing. In this case, the question is whether Home's belated explanation that it wanted the photographs as possible evidence represents a sufficient justification. Generally speaking, the efficient gathering of relevant evidence is a legitimate endeavor. The frequency with which disputes over picket signs and picketing activity come before the Board and the courts suggests that photographing picket line activities may sometimes be a proper means of recording occurrences. Photographing of pickets does not violate § 8(a)(1) of the Act where the photographs are taken to establish for purposes of an injunction suit that pickets engaged in violence. *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 819 (6th Cir. 1975).

In *Larand Leisurelies, supra* at 819, the court ruled that

if no photographs are introduced into evidence in the injunction proceeding, it may be inferred that the photographing was not intended for a valid purpose but, on the contrary, was intended to interfere with the activity secured by Section 7 of the Act.

In that case, as here, there was no evidence that the company used any photographs in support of an effort to secure injunctive relief.

Candor compels us to admit that we find some difficulty in attaching controlling significance to the factual inquiry as to whether the company has used picket-line photographs as evidence in an injunction suit. Anticipated litigation for which photographic evidence is secured does not always develop. This is true for many reasons, not

the least of which is the settlement of the basic controversy. Further, it may be reasonably anticipated that violence or other improprieties may develop on a particular picket line, but it does not for any of several reasons. To require that the photographs have to be actually used in court proceedings would be to require the one having the pictures taken to act at his peril that developments with evidentiary value would occur. After improper conduct has occurred, the opportunities for recording it photographically are nonexistent.

In *NLRB v. Rybold Heater Co.*, 408 F.2d 888, 891 (6th Cir. 1969), the court enforced a Board order to cease and desist from photographing or pretending to photograph protected activity. The company's witnesses testified that they pretended on occasion to take moving pictures of the pickets and of employee efforts to dissuade truckdrivers from carrying away or delivering goods to Rybold's plant. The company also argued that the photographs were taken for use in two unsuccessful injunction proceedings subsequently had, but it turned out that none of them were introduced into evidence in either proceeding and that, in fact, some of the photographs were never developed and others were processed after the suits had been terminated. Since the effect of Rybold's photographic exercises, often with unloaded cameras, was to scatter the pickets and halt their activities, the court found substantial evidence in the record to support the Board's order preventing such photography.

*Larand Leisurelies, supra,* appears to follow the *Rybold* majority in attaching significance to factual inquiry on the question whether or not the company has introduced the photographs in an injunction proceeding. A concurring judge approved the result reached in the case but had

> reservations concerning the emphasis placed on the fact that the photographs in controversy were not introduced into evidence in the injunction proceedings . . . . [W]hether photographs were ultimately received in evidence or even developed is immaterial and the emphasis

on those subjects seems capable of being read as a limitation on what would otherwise be a proper means of recording occurrences. [408 F.2d at 891 (Peck, J., concurring).]

We deem it inadvisable to put our stamp of approval upon the mechanical application of a rule that a company's failure to initiate an injunction suit or to introduce picket-line photographs therein leads almost automatically to an inference that its photographic activity was intended to interfere with employees' Section 7 rights. Our enforcement of the Board's order in *Flambeau Plastics* must be read in the light of the numerous and serious violations of the employees' rights disclosed by the record in that case. The present case is much different.

Still, there can be little question that, under certain circumstances, picket-line photography can have a tendency to interfere with, restrain, and coerce employees in their efforts to engage in concerted activities. Here, there is absolutely no evidence that Home even instituted proceedings seeking injunctive relief, much less relied upon the photographs as necessary or vital evidence. Nor was there evidence that Home employees were engaged in violence, trespass or blocked ingress or egress to the home. The evidence as to the stopping of delivery vehicles on a few occasions never attempted to pinpoint an exact date for such occurrences, so that there is nothing in the record supporting an inference that such momentary stoppages occurred at a time contemporaneous with the attempted photo-taking by Swiatek.

■ Although we find less than persuasive the rationale employed by the *Rybold* majority and by the *Larand Leisurelies* panel, we do think that the Board could attach some significance, even if not controlling significance, to the fact that Home never attempted to use the photographs as an evidentiary exhibit in an injunction suit. Absent any probative evidence that picket-line disruption took place on the two days when Swiatek commenced, upon his attorney's advice, the challenged photo-taking, we find no basis in the record for modifying

or setting aside the Board's order that Home cease and desist from photographing or creating the appearance of taking pictures as its employees peacefully picket. Substantial evidence on the record as a whole supports the Board's finding that the company's picture-taking created the appearance of coercive surveillance for purposes of future reprisal and as such violated § 8(a)(1) of the Act. The limitation on our review imposed by § 10(e), 29 U.S.C. § 160(e), precludes this court from drawing a contrary inference.

## IV. The Strike

The ALJ and the Board disagreed about the nature of the strike. The characterization of the strike has a significant impact upon the claimed right of the strikers to reinstatement. *See NLRB v. Juniata Packing Co.,* 464 F.2d 153, 155 (3d Cir. 1972). If Home's employees were unfair labor practice strikers, they are entitled to reinstatement. On the other hand, if Home's employees never had, or subsequently lost, the status of unfair labor practice strikers, the basic ground for the Board's reinstatement and backpay order would evaporate. The ALJ concluded that the overriding reason for the strike was recognitional, but the Board found that Home's unfair labor practices "clearly contributed" to their desire to take the concerted action of engaging in the strike.

Where the Board and the ALJ disagree on questions of motivation, the reviewing court has an obligation to examine more carefully the evidence. *Cf. Larand Leisure-*

lies, *supra* at 820. In *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Supreme Court ruled that judicial review of the record should not be one-sided, concentrating only on evidence which supports the Board's findings. The ALJ's decision should be given the support it intrinsically commands, and its significance often depends on the importance of credibility in the particular case. *See id.* at 495–96, 71 S.Ct. 456. *Accord, NLRB v. Marland One-Way Clutch Co., Inc.,* 520 F.2d 856, 865 (7th Cir. 1975); *NLRB v. Wire Products Mfg. Corp.,* 484 F.2d 760, 763–64 (7th Cir. 1973).

In the present case, Union Representative Potterton and a number of Home employees testified as to the reasons for the strike. Thus, Potterton testified that the employees struck "because we did not get an answer to the letter that we sent on the 25th, 26th." As previously noted, Potterton had explained to the employees that their strike would be an unfair labor practice strike and that they could not be replaced.[9] A field representative's conclusion regarding the nature of the strike, of course, is not determinative of the question. The record does establish that the employees accepted Potterton's representations. Indeed, Home employees testified that the reasons for the strike embraced both the purposes of securing union recognition and doing something about the unfair labor practices. Close review of the record indicates that the employees tended to assign the latter as the basic reason.[10]

---

**9.** Upon the direct examination by counsel for the General Counsel of Home employee Coleman, we find this exchange:

   Q  Do you recall there being any discussion by Mr. Potterton of the reason for striking?
   A  He explained to us that it would be an unfair labor practice strike.

**10.** Upon the direct examination of employee Barry, we find this exchange:

   Q  Was there a vote taken as to whether or not to go on strike?
   A  Yes.
   Q  And would you tell us, as best you can remember, please, what the reasons were?
   A  Because of the unfair labor practices.

Similarly, upon the direct examination of employee Cruse, we find the following:

   Q  Was there some discussion of striking?
   A  Yes.
   Q  Would you tell us what that was, please?
   A  Mr. Potterton was there and he explained to us there had been apparently some unfair labor practices that the nursing home had committed or supposedly had committed and that he was filing a petition [charges] and that it was up to us to go out on strike or not.
   Q  Was there any discussion of the reasons for striking?
   A  Because of the unfair labor practices.

The testimony of Home employees Barry and Cruse was the clearest and most explicit evidence that Home employees had struck because of unfair labor practices. Yet the ALJ concluded that the overwhelming weight of the evidence revealed that the Union and employees were motivated in having a strike as a means of putting pressure on Home to recognize immediately and voluntarily the Union as bargaining agent. The ALJ made no express credibility determination as to witnesses Barry and Cruse regarding their testimony regarding the reasons for the strike, but the record allows no other conclusion than that the ALJ discredited at least that part of their testimony.

■ Although the Board in the present case purports not to have rejected the finding of the administrative law judge with respect to any credibility determinations, it is clear from our reading of the opinions of the ALJ and of the Board that the Board has in fact rejected the implied finding of the ALJ on a credibility matter. *See Wire Products, supra* at 764. It did so upon the basis of its own finding that the unfair labor practices clearly contributed to the strike decision. It further relied upon the well established principle that employees may be entitled to the special reinstatement rights provided unfair labor practice strikers even though the strike activity may have been motivated by concerns which went beyond the employer's commission of unfair labor practices, so long as it can be determined from the record as a whole that the unfair labor practices contributed in part to the employees' decision to strike. 218 NLRB at 8.[11]

■ If an unfair labor practice is a "contributing cause" of a strike, then as a matter of law, the strike must be considered as an unfair labor practice strike. *NLRB v. Wooster Div. of Borg-Warner Corp.,* 236 F.2d 898 (6th Cir. 1956), *rev'd on other grounds,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). If substantial evidence on the record as a whole supports the inference that the unfair labor practices committed by Home were contributing causes of the strike, we must uphold the Board's finding and order. *See Larand Leisurelies, supra* at 820–21.

Thus, the crucial question regarding the strike is whether there was a reasonable basis for the Board's inference that the strike was both a demand for union recognition and a protest against Home's unfair labor practices. *See Juniata Packing, supra* at 155. More technically, we must ascertain whether there was "proof of causal connection between the two to justify the finding that the strike was bottomed in part upon unfair labor practices entitling striking employees to reinstatement." *Winter Garden Citrus Pr. Coop. v. NLRB,* 238 F.2d 128, 129 (5th Cir. 1956). In this case, as in *Larand Leisurelies, supra* at 820, there was no express finding by the ALJ that unfair labor practices were *not* contributing causes of the strike.[12]

■ Reviewing the record as a whole, including the ALJ's opinion with its implied credibility determinations, we conclude that the Board's finding as to the causal connection between the unfair labor practices and the strike is not supported by substantial evidence. We agree with the ALJ that, under the circumstances, the claimed unfair labor practices were not the type reason-

11. Because the Board recognized that this determination was an inferential one, this case is governed by well-recognized principles applicable to judicial review. This court may not displace the Board's choice between two fairly conflicting views of the evidence, *Townhouse Appliances, supra* at 829, but it is not barred from setting aside the decision if it cannot "conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including that body of evidence

opposed to the Board's view." *Universal Camera Corp., supra* at 488, 71 S.Ct. at 465. *Accord, Marland One-Way Clutch, supra* at 865; *NLRB v. Wisconsin Aluminum Foundry Co.,* 440 F.2d 393, 398 (7th Cir. 1971).

12. We deem it unnecessary to determine whether the ALJ's implied discrediting of the testimony of employees Barry and Cruse as to the reasons for the strike, see note 10 *supra,* also implies a finding that unfair labor practices were not contributing causes of the strike.

ably to be expected to cause a union or employees to seek the self help use of a strike for correction.

Assuming that the question of "causal connection" is one of fact rather than law, an inference that the unfair labor practices played a substantial role is unsupported by the record. At the outset, we note that the Board confronted the argument of the counsel for the General Counsel that "the overriding purpose of the strike, if one must be assigned, was to protest the Respondent's numerous and substantial violations of Section 8(a)(1). . . ." That the impartial Administrative Law Judge had assigned as the overriding purpose an entirely different object was clear. Recognizing the difficulty of the question, the Board thought it unnecessary to determine "which concerns predominated in the employees' minds in determining to go out on strike (if indeed recognition was an object)," for it could find that the unfair labor practices contributed to their desire. Inasmuch as the counsel for the General Counsel virtually conceded that recognition was an object, we find some difficulty in ascertaining the thrust of the "if indeed" parenthetical. Similarly, we find it difficult to understand why, having found it unnecessary to determine predominant or primary motives, the Board could note, without finding, that "the Union commenced its picketing *motivated in substantial part* by Respondent's unfair labor practices"; the record provides little or no basis for passing over the question of primacy or predominancy and then noting substantiality.

Nonetheless, it is not our function to detail the possible inconsistencies of the Board's stated rationale. We must examine the record in the light of the facts and the applicable law.

Apart from the unlawful photo-taking and the grant of the employee Pierson's wage increase, both of which took place after the meetings at which Home employees discussed a strike, the only sustainable violations of the Act took place many days before the strike decision. The impetus for

the meetings was the receipt of the decision and order dismissing the representation petition. Thereupon, Union Representative Potterton convened meetings to discuss what action should be taken. Although he advised the employees that they were striking "because of the unfair labor practices," the record evidence overwhelmingly points to the conclusion that recognition was the object, solely and simply, with window-dressing of propriety being found in the supposed unfair labor practice charges.

The evidence of the discussion in the April meetings of Home's supposed unfair labor practices is not sufficient to establish what *Winter Garden* characterizes as a "causal connection" between those practices and the strike. In our view, the strike was plainly, blatantly, and patently a strike for recognition. The only reasonable inference is that Potterton was from the inception of the first April meeting engaged in "an ex parte effort to make a record by assuming an attitude which was inconsistent with other facts definitely established." *Winter Garden, supra* at 130.

In the *Winter Garden* campaign to organize citrus fruit workers, Organizer E'Dalgo engaged in self-serving actions having no relevance to the situations of the parties or the status of the negotiations. *Id.* at 130. The Fifth Circuit was able to pierce the appearance of his argumentative communications regarding a refusal to bargain in good faith and the company's supposed discrimination against union members and to put them in their real light as an attempt to salvage what he could from an ineffectual strike.

The evidence established that the Union Field Representative sought at the outset to minimize the risks of the organizational campaign by obscuring its recognitional object. His explanation as to why the employees were striking, see note 9 *supra,* was designed to insure that, should the strike prove unsuccessful in bringing about recognition, the picketing employees would have a job to which they could return. Although Potterton's representations about the nature of the strike and the consequences

thereof may have influenced employees to vote to strike, that causal relationship should not obscure what was the real and actuating motivation.

A fair reading of the record in this case reflects that the employees who testified as to the motivation of the strike were doing nothing more than parroting the unfair labor practice protective garment that the Union Field Representative was fashioning to insure the right of reinstatement in the event the strike did not force recognition. The witnesses fell back when asked as to the *reasons* for the strike on the simplistic but non-detailed attribution of unfair labor practices. Employee Barry stated at one point in her testimony that "Jim [Potterton] explained like some of the unfair labor practices that happened at Colonial Haven," but the record is silent as to what these practices were. As has been previously noted, employee Cruse's testimony threw no more light on what the claimed unfair labor practices were which were putting these people on the street:

> Mr. Potterton was there and he explained to us there had been *apparently* some unfair labor practices that the nursing home had committed or *supposedly had committed.* . . . [Emphasis added.]

Potterton's testimony is not much more illuminating as to why these working people would be taken out onto the street to protest supposed unfair labor practices, particularly when the matter is considered in the light of the fact that two days before the strike began a charge was filed with the Regional Director with regard to the claimed interrogation, the granting of benefits, and the promise to grant benefits. Either Potterton lacked confidence in the efficacy of the Board processes or, as it is obvious to us, he was utilizing the form of unfair labor practices ostensibly only, the real purpose being to accomplish recognition which he realized otherwise would be delayed many months:

> I outlined to them three possible alternatives. I said, we can file for a new election, and I said that would take anywhere

from six months or a year before we could find out anything on that, or we could appeal the decision of the Regional Director on the question of their dismissing our chance to have an election. I also mentioned that we could, or that we would file charges based on the evidence that we have unfair labor practices. I also said that I felt that the possibility of having a strike would be one way in which we could both get some recourse and get an election, and also get the company to cease their unfair labor practices. I discussed the idea of what a strike meant.

Potterton's letter gave less than 24 hours to the company to take action in good faith "to settle these charges." To ask the question of whether, if the company had given ironclad assurances that they would not interrogate employees with reference to union membership and would not grant or promise to grant benefits to employees in order to discourage union membership, the strike would have been called off is to answer the question. Potterton's actions at the meetings he held with the employees which resulted in taking these people out on picket lines for the claimed purpose of remedying unfair labor practices, which can scarcely be termed egregious but as to which Board processes had already been initiated, cannot, it appears to us, be termed other than bordering upon irresponsible labor leadership - under the circumstances. Credulity is pushed beyond the breaking point to think that the conduct of the company here, including that which the Board found, although the Administrative Law Judge did not, to be unfair labor practices, and which, being viewed in the most charitable light, consisted of technical violations of the Act, was of such a nature as to require resorting to the street in protest.

That the testimony of Potterton and most of the employee witnesses was found lacking in credibility insofar as it indicated that an actuating cause of the strike was the claimed unfair labor practices is reflected in the ALJ's decision:

Potterton, and most of the General Counsel's witnesses who testified as to the union meetings, testified to the effect that the recourse sought was cessation of unfair labor practices and the securing of an election. Pierson testified to the effect, and *I credit such testimony,* that Potterton alluded to securing recognition from the Respondent. The totality of the facts, including a union press release and bulletin, and employee signs used in picketing, reveals that the employees and union sought to secure recognition of the Union by the Respondent. Considering all of such facts, as indicated, *I credit Pierson's testimony as indicated.* [Emphasis added.]

Although Pierson only attended one meeting, she clearly understood Potterton's message that the company "didn't want to recognize the union and he thought that, he was asking us if we thought we should strike or something."

Later when the employees decided to call off the strike, Pierson asked Potterton "why should we end the strike after we had gone so far and we didn't have what we walked out for and he said that he didn't think the picket lines that we had were doing any good." This remark can only attain meaningfulness in the reference context of a recognition strike.

We cannot conscientiously find that substantial evidence supports the Board's causality determination, and we decline to sustain its order and decision on that ground.

For the reasons set out in this opinion, and in accordance therewith, the Board's order will be enforced with the exception of that portion thereof designated as ¶ 2(a) and ¶ 2(b) pertaining to discharged employees and that part of the notice to be posted which is based thereon. Enforcement will be denied as to such excepted parts.

ENFORCEMENT GRANTED IN PART;. ENFORCEMENT DENIED IN PART.

---

## ON PETITION FOR REHEARING

In its petition for rehearing the National Labor Relations Board does not challenge the holding of the panel in the present case but asks for rehearing to the end that this case be remanded to the Board for the determination of the rights of the strikers as economic strikers. In this respect the Board in its petition asserts that the "panel, apparently by oversight, failed to remand the case to the Board for a determination of their [the strikers'] rights to reinstatement and backpay as economic strikers." This formulation of the matter suggests that remand for the indicated purpose should have followed automatically from our disposition. We do not so regard the matter but view the question of remand as one for determination in our equitable discretion. The panel in its original opinion having addressed itself to all of the issues raised in this proceeding did not "by oversight" overlook the remand matter, being of the opinion that it was not necessary to address the issue.

The matter having now been raised by the Board, we will reconsider the matter and in so doing note the following:

Assuming for the present matter that recognition strikers are either economic strikers or at least under most circumstances would be treated similarly to economic strikers, we note that the Administrative Law Judge (ALJ) being of the opinion that the strike was clearly for an unlawful purpose, found that the employees' striking activity was not protected and the company had no obligation to reinstate them "either on the basis of rights as unfair labor strikers or even as economic strikers." The Board in disagreeing with the ALJ did not similarly address itself to the matter of a possible status as economic strikers. In the pending petition for rehearing, the Board concedes that it "made no findings of fact nor conclusions of law regarding the reinstatement rights of the strikers because it concluded that they were unfair labor practice strikers, a conclusion which it thought dispositive of the proceeding."[1] At no

---

1. Reliance upon the correctness of a position when alternative grounds of support are existent may be a perilous course. Thus, in *NLRB*

*v. Aluminum Products Co.,* 120 F.2d 567, 573 (7th Cir. 1941), the respondents moved for leave to produce additional evidence. The ex-

place in the briefing or oral argument prior to the filing of the opinion in this case did the Board suggest that in the event the strike was found not to be an unfair labor practice strike, consideration should be given either by this court or by the Board on remand to the possibility that the strikers had the protection accorded to economic strikers.

That the Board did not choose to address in any way the possible status of the strikers as being of the economic variety, despite its clear potential as a dispositive issue, may well have flowed from factors possibly militating against this as being a viable dispositive issue. One of the exceptions of the counsel for the General Counsel in part was directed to the ALJ's "failure to provide a full and adequate remedy for Respondent's refusal to reinstate the strikers on request." In the brief in support of the exceptions,[2] the following appears:

The uncontroverted evidence in the instant case is clearly sufficient to show that the principal reason for the strike and picketing by Respondent's employees was both to protest and to seek to remedy the substantial unfair labor practices committed by Respondent in its efforts to avoid unionization. The Board should so find and conclude, contrary to Administrative Law Judge's findings and conclusions, and should therefore determine that the strike was an unfair labor practice strike and the strikers therefore entitled to reinstatement and backpay, even though one of the objects of the strike and picketing was to force Respondent to recognize and bargain with the Union and, the Union, by picketing for more than 30 days without filing a new petition, may have violated Section 8(b)(7)(C).

The Board in its Decision and Order, which proceeded on the premise that the strike was an unfair labor practice strike, disposed of the Section 8(b)(7)(C) issue on the basis that Home had not relied upon the employees' picketing beyond 30 days without filing a petition. The Board further, however, stated that even assuming arguendo there was a technical violation of the Section, this was not such as to warrant denying the employees "their special reinstatement rights as unfair labor practice strikers." The Board then in commendable candor did in a marginal note advert to the implicit problem presented by Section 8(b)(7)(C) if this strike, as we have held it to be, was purely for recognitional purposes, which marginal note is as follows:

Cf. *Local Union No. 707, Highway and Local Motor Freight Drivers, Dockmen and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Claremont Polychemical Corporation)*, 196 NLRB 613 (1972), where the majority of the Board refused to provide a reinstatement remedy for two employees who participated in picketing which was found to be violative of Sec. 8(b)(7)(B) of the Act. In that case, the picketing was charged, litigated, and found to be violative, and the employer relied on the picketing as the reason for denying the employees reinstatement. It is also significant that there the picketing was solely in support of recognitional objectives and therefore did not present some of the offsetting considerations present in an unfair labor practice strike setting, such as this one, and upon which is predicated the special reinstatement rights of unfair labor practice strikers. See *Mastro Plastics Corp., et al. v. N.L.R.B.*, 350 U.S. 270 [76 S.Ct. 349, 100 L.Ed. 309] (1956).

In the present petition for rehearing the Board avers that the panel of this court

---

cuse for failure to produce at the hearing was that at that time respondents did not think the Board had established a prima facie case and did not believe that they were subject to the provisions of the act. The application to offer additional evidence, this court held, came too late.

2. Although the record of pleadings certified by the Board contained the respondent's brief supporting cross exceptions, the record did not contain a copy of the General Counsel's brief. The omission appears to be in accordance with 29 C.F.R. § 102.45(b). The General Counsel's brief was furnished to this court pursuant to an order entered by this court on its own motion.

"reserved decision on the issue of whether employees engaged in recognitional picketing in excess of the thirty-day period prescribed by Section 8(b)(7)(C) lose their employee status, and whether the Home could raise this issue since it did not file a Section 8(b)(7)(C) charge within the six-month limitation period prescribed by Section 10(b) of the Act. . . . Accordingly, the panel concluded that the strikers did not engage in any conduct resulting in the loss of employee status.

With all respect to the Board, we read our opinion somewhat differently than does the Board. It is true that we reserved decision on the applicability of the Section 8(b)(7)(C) issue, but this was scarcely in the recognitional picketing context because the matter of the reinstatement of the picketers as recognitional-economic strikers was not before this court, it never having been presented to this court. We further did not purport to express any opinion on whether the strikers as recognitional strikers did or did not engage in any conduct resulting in the loss of employee status. We did refer to other tangential aspects of this issue which might not be easy of resolution.

Finally, as to whether the employees lost their protected employee status, we must note another matter which was not pursued by either of the parties before us and which therefore did not figure in our disposition of the case presented to us. In determining the strike was legal and the employees were protected as unfair labor practice strikers, the Board referred to its "expanding unit principles" which had here precluded an immediate election and then, without citation of authority in its Decision and Order, stated of its policy that "it was never intended, however, to preclude an employer and employees from entering into an agreement providing for terms and conditions of employment until such time as a petition has been filed for the expanded unit." This is far different than saying that during the interim period provided by the application of the "expanding unit principles," employees acting collectively through a union can legally strike to force the entering of an agreement which would have no legal recognition by the Board. While we express no opinion on this matter, we do discern anomalous aspects in a situation in which employees could strike to achieve a contract without durational qualities and recognition which would not be recognized by the Board.

Inasmuch as the Board was considering the employees' rights of reinstatement in the light of the special reinstatement rights of unfair labor practice strikers, the Board gave no particular consideration to Home's position that the strikers had been replaced. Now in the pending petition for rehearing, the Board would find no problem in the record in resolving this issue. We cannot agree that the record is lacking ambiguity in this respect. Thus, testimony at the hearing indicated that although some replacement employees were relatives of people working at the home, including Swiatek, one of these was still working there and another would have been except for illness. Further, it must be remembered that the context of employment here was a transitional one to the extent that the Regional Director had dismissed the representation petition because the unit was not representative of that which would be employed in the future.

In our resolution of the question presented by the petition for rehearing, we are mindful not only that we are empowered to remand to the Board but are not required to do so and, as a court, must act within the bounds of the statute and without intruding upon the administrative province but also that we may adjust relief to the exigencies of the case in accordance with the equitable principles governing judicial action. *NLRB v. National Motor Bearing Co.*, 105 F.2d 652, 657 (7th Cir. 1939).

The Board in its petition for rehearing has cited to us cases in which the courts have remanded in situations wherein it appeared that the cases under considera-

tion required further administrative resolution.[3] In many cases in which enforcement is denied it would appear that the exercise of sound judicial discretion would indicate the desirability, if not the necessity, of remand for further proceedings reflected as being appropriate by the record before the reviewing court. In *Barton Brands,* one of the cases cited by the Board, the panel apparently found the existence of sufficient alternative grounds to support a Board order even though disagreeing with the grounds upon which the board had based its order. In *San Francisco Typographical,* the court disagreeing with the Board, was of the opinion that the assessment of fines by the union was within its power but this decision necessitated a determination of the reasonableness of the fines. This necessity occasioned the remand. In *Southern Materials,* the court disagreed with the Board's construction of a contractual provision but was of the opinion there was sufficient in the record bearing directly on the question of the propriety of the company's unilaterally discontinuing a Christmas bonus to employees to require further administrative consideration on remand. In *Laclede Gas Co.,* the majority, although apparently troubled about the question, did find sufficient persuasive reasons for remanding. Judge Van Oosterhout, in dissenting from the remand, relied upon the fact that ordinarily questions not raised, briefed, or argued before an appellate court should be given no consideration. He further opined that a remand on the record before the court would serve no useful purpose. We cannot agree that the waiver principle applicable to ordinary civil litigants necessarily applies to a litigant such as the National Labor Relations Board, which is certainly in a larger sense representing the public interest. On the other hand, we entertain the idea that there is a public interest in bringing litigation in the area of labor relations to an end without the unseemly delay which could easily be involved when the administrative agency declines to resolve the issues presented to it, resulting in several moves back and forth between agency and court.

Here while we find present some of the factors found persuasive by other courts in considering the matter of remand, we are impressed by the fact that despite the ALJ's determination that Home had no obligation to reinstate the striking employees either on the basis of rights as unfair labor strikers or even as economic strikers, when confronted with the Section 8(b)(7)(C) problem raised by the General Counsel, the solution to which problem is still unresolved,[4] the Board avoided determining the economic striker issue notwithstanding that the company had asserted that it did not put the strikers back at employment because they had been replaced, a reason that Home ordinarily could only legitimately advance in an economic strike context, certainly not in the unfair labor practice strike situation. We are not saying that a duty rests upon the administrative agency in every case to resolve every alternative issue having a potential bearing upon the case before it; ordinarily it is sufficient to reach and decide the issue deemed dispositive. Here, however, the situation is one in which the secondary aspect should not have been avoided.

If remand for further proceedings were not to occur, the result of that avoidance would be that a new and entirely different lawsuit would be implanted upon the bare framework of a case which upon the entire record we deem to have reached a final and appropriate disposition.

Under the circumstances of this case, even though the case may be a close one, we think the decision reached by this court

3. *SEC v. Chenery Corp,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Barton Brands, Ltd. v. NLRB,* 529 F.2d 793, 798 (7th Cir. 1976); *NLRB v. San Francisco Typographical Union No. 21,* 486 F.2d 1347, 1350 (9th Cir. 1973), *cert. denied,* 418 U.S. 905, 94 S.Ct. 3195, 41 L.Ed.2d 1152; *NLRB v. Southern Materials Co.,* 447 F.2d 15, 19 (4th Cir. 1971); *Laclede Gas Co. v. NLRB,* 421 F.2d 610, 616–18 (8th Cir. 1970).

4. And which is one which probably could not properly be resolved without an evidentiary hearing.

in *American Brake Shoe Co. v. NLRB,* 244 F.2d 489, 494–95 (7th Cir. 1957), should be followed and the following language of the opinion in that analogous case is therefore appropriate for the disposition of the present petition for rehearing:

In arriving at the conclusion that an unfair labor practice had been committed, the trial examiner found that, by closing down its plant after I.A.M. had filed the requisite notices under Section 8(d), petitioner had encroached upon § 8(a)(5). The Board, in its decision, did not pass on this particular theory. In a footnote it merely stated: "In our view of our decision herein, we do not reach and therefore do not determine whether, in laying off its employees and shutting down, the Respondent (petitioner herein) failed to comply with the requirements of § 8(d) of the Act and thereby violated § 8(a)(5)." In our view this did not constitute a reservation of the point by the Board. Furthermore, the question of the applicability of § 8(d) was not urged on review. If, as is advocated, this case were remanded to the Board for a determination of the § 8(d) issue, this action would merely give the Board another bite at the proverbial cherry, and, if such conduct were condoned, piecemeal litigation would result. Consequently, the request for remand is denied, and the order of the Board is vacated and set aside.

PETITION FOR REHEARING DENIED. .