_____

No. 94-3610
_____

F. L. Thorpe & Co., Inc.,          *
                                   *
          Petitioner,              *
                                   *
     v.                            *
                                   *
National Labor Relations Board,    *
                                   *
          Respondent,              *
                                   *
United Steelworkers of America,    *
AFL-CIO/CLC,                       *
                                   *
          Intervenors.             *

_____                        On Petition For Review and
                                   Cross-Application for
No. 94-3911                        Enforcement of an Order of the
_____                        National Labor Relations Board.

F. L. Thorpe & Co., Inc.,          *
                                   *
          Respondent,              *
                                   *
     v.                            *
                                   *
National Labor Relations Board,    *
                                   *
          Petitioner,              *
                                   *
United Steelworkers of America,    *
AFL-CIO/CLC,                       *
                                   *
          Intervenor.              *

                              _____

              Submitted:  April 10, 1995

                 Filed:  December 1, 1995
                              _____

Before MAGILL and HANSEN, Circuit Judges, and GOLDBERG,[*] Judge.

_____

GOLDBERG, Judge.

F.L. Thorpe & Co., Inc. ("Thorpe" or "the Company") petitions for review of an order of the National Labor Relations Board ("NLRB") which concluded that unfair labor practices committed by Company agents converted an economic strike by the United Steelworkers of America ("the Union") into an unfair labor practice strike. Thorpe also seeks review of the NLRB's conclusion that once converted into an unfair labor practice strike, actions taken by the Company failed to reconvert the strike back into an economic strike. The NLRB has filed a cross-application for enforcement of its order. The Union has intervened in support of the NLRB's cross-application. The court exercises jurisdiction pursuant to 29 U.S.C. § 160(e), (f). Because we find that the NLRB erred as a matter of law in concluding that the unfair labor practices committed by Company agents converted the Union's economic strike into an unfair labor practice strike, we reverse.

## I.   BACKGROUND

Following a hearing of this matter, the Administrative Law Judge[1] ("ALJ") made the following findings of fact which the NLRB panel subsequently adopted. F.L. Thorpe & Co., 315 NLRB No. 22, at 1-2 (Sept. 30, 1994). The Company manufactures and sells Black Hills gold jewelry. On July 27, 1990, the Union was certified as the exclusive representative of the Company's production and maintenance employees for purposes of collective bargaining. The

_____

[*]   The HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

[1]   The Honorable Burton Litvack, Administrative Law Judge.

-2-

parties met 14 times over the ensuing nine months in an unsuccessful effort to negotiate a first contract.

On April 27, 1991, after learning that a strike was possible, the Company's general manager, Terry Sanke, drafted a letter to all unit employees advising them that they had a right to withhold their services in connection with a strike, or to cross the picket line. The letter also stated that the Company would continue to operate and that it had the right to hire permanent replacements to perform the employees' jobs.

On April 28, 1991, Company Supervisor Judy Lamphere called employee Susan Cox to tell her that the Union had decided to call a strike. Lamphere also told Cox that "they" would be working and would give Cox a ride to work, but that she had to resign from the Union in order to return to work during a strike. Cox informed Lamphere that she had decided to join the strike, and repeated Lamphere's remarks to at least six other employees. There is no record evidence as to whether said conversations were prior to or subsequent to the start of the strike.

On April 29, 1991, sixty-seven of the eighty-two unit employees commenced a work stoppage against the Company. That same day, Terry Sanke drafted another letter to the bargaining unit employees, advising them that they had three options during a strike: (1) to refuse to cross the picket line; (2) to cross the picket line; or (3) to resign from the Union and return to work. The letter stated that employees who wanted to cross the picket line and avoid being fined by the Union should resign from the Union first. Sanke included with the letter a sample resignation form with instructions for completing and returning it to the Union.

On May 11, 1991, striking employee Linda Smith called Supervisor Carol Tribble and expressed an interest in returning to

work. Tribble told Smith that in order to return to work she first had to sign a Union resignation form and place it in the mail. In addition, Tribble stated that Smith's anniversary date would be pushed back for every week she was out on the picket line.

Smith subsequently related her discussion with Tribble to fellow striking employee Cindy Kruse. Kruse called Tribble, who stated that in order to return to work Kruse first had to sign a Union resignation form and place it in the mail. Tribble later told Kruse that her anniversary date would be set back a week for every week she stayed out on strike. Kruse decided not to return to work at that time.

The striking employees picketed the Company's plant on most if not all days during the strike. Picket signs went up shortly after the strike's inception. Notably, at no time during the duration of the strike did the picket signs change in response to actions taken by Company agents; rather, at all times the picket signs alluded solely to economic reasons for the strike. The picket signs never indicated that the strike was intended to be an unfair labor practice strike.

During June, July, and August of 1991, there was much shouting of invectives and insults between the strikers, the replacement employees, and the Company's supervisors. In particular, on several occasions the Company's credit manager, Sandy Sanke, shouted: that the strikers did not have jobs there anymore; that they were fired; that the strikers should go find a job and get a life; and that a particular employee was a "jobless wonder."

On or about August 2, 1991, Company officials learned that the Union was alleging that Company representatives had made unlawful threats and other comments as early as the day before the strike began. Terry Sanke investigated the matter by speaking with the Company representatives named by the Union. The Company

representatives all denied making illegal comments. In a letter sent to each of the striking employees dated August 8, 1991, Terry Sanke stated that the Company's management had not made or implied any statements that strikers no longer had jobs with the Company, and that any information they had to the contrary was inaccurate and should be disregarded. Sanke further explained their rights as economic strikers. However, the ALJ found that Sandy Sanke continued, at least throughout the month of August, to tell strikers: that they did not have jobs; to go home; that they were fired; and that a particular striker was a jobless wonder.

On August 27, 1991, the Union filed an unfair labor practice ("ULP") charge with the NLRB, repeating its earlier allegations. On October 8, 1991 and January 9, 1992, respectively, the Union filed a first and second amended ULP charge with the NLRB. Following an investigation, the Regional Director of Region 18 of the NLRB issued an amended complaint on January 21, 1992. The amended complaint alleged that the Company violated section 8(a)(1) of the National Labor Relations Act ("the Act") by informing an employee that she was required to resign her union membership before returning to work if she engaged in a strike; by warning employees that their anniversary dates would be set back one week for every week they remained on a picket line; and by telling employees that, because they engaged in a strike, they were no longer employed by the Company. The amended complaint further alleged that the Company violated sections 8(a)(1) and (3) of the Act by refusing to reinstate employees, following unconditional requests to return to work, unless they resigned their union memberships; and, as the employees' economic strike was allegedly converted to a ULP strike by the aforementioned conduct, by refusing to reinstate striking employees to their former positions following unconditional offers to return to work.

The employees' strike continued through September 1991, by the end of which month the Company had hired and employed approximately

28 permanent replacement employees and 20 bargaining unit employees who had either not joined the strike at its inception or who had since abandoned the strike. On September 30, 1991, the Company sent Smith and Kruse a letter offering them immediate and unconditional reinstatement. The letter expressly stated that they did not have to resign their union memberships before returning to work. The Company sent Smith and Kruse another letter on October 7, 1991, clarifying that in addition to being reinstated, they would be paid all back pay to which they were entitled under the Act.

On October 4, 1991, the Company mailed to every striking employee and posted on its plant bulletin boards a letter, signed by Terry Sanke, advising employees that resignation of union membership had never been a condition for returning to work for the Company and that no striking employee had been, or ever would be, discharged because they chose to participate in the strike. The Company sent another letter to all employees dated October 8, 1991, in which it disavowed any threat to set back anniversary dates as well as any statements that strikers were fired or had to resign from the Union in order to return to work; the Company also acknowledged that if such statements were made, they were unlawful. On October 11, 1991, the Union unconditionally offered to return its members to work. Twenty-one former strikers whose names appeared on a seniority list received reinstatement letters; eleven of these striking employees subsequently accepted reinstatement.

A trial was held before the ALJ on February 25 and 26, 1992. The ALJ found that the Company had indeed violated section 8(a)(1) and sections 8(a)(3) and (1), as alleged in the amended complaint. In particular, the ALJ found that: (1) Tribble's statement that the strikers' anniversary date would be pushed back and Sandy Sanke's remarks to strikers throughout the strike violated Section 8(a)(1) of the Act; and (2) the Company's refusal to reinstate Smith and Kruse unless they first resigned from the Union violated Sections

8(a)(3) and (1) of the Act.  However, the ALJ rejected the contention that these ULP's prolonged the strike and thus converted it into an unfair labor practice strike.

Upon review before a three-member panel of the NLRB ("the Board"), the Union took exception to the ALJ's finding that the strike was not converted into an unfair labor practice strike on May 12, 1991.  The Union further took exception to the ALJ's finding that there was no subjective evidence that the ULP's committed by the Company motivated strikers to prolong their work stoppage.  In addition, the Company filed an exception to the ALJ's failure to find that, even if the strike was converted into an unfair labor practice strike, it was reconverted into an economic strike prior to the Union's unconditional offer to return to work.

On September 30, 1994, the Board rendered a decision and order reversing the ALJ's decision.  F.L Thorpe & Co., Inc., 315 NLRB No. 22.  Relying upon both objective and subjective analyses, the Board held that the Union's economic strike converted into an unfair labor practice strike on or about May 12, 1991.  The Board further held that the Company never successfully reconverted the strike into an economic strike.  The Company presently challenges each of the Board's conclusions.

## II.   STANDARD OF REVIEW

NLRB unfair labor practice actions are formal adjudications, which are governed by the Administrative Procedures Act.  Additionally, 29 U.S.C. § 160(b) (1988) provides that NLRB unfair labor practice actions "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure applicable for the district courts of the United States."  As a result, the agency's opinion must contain "findings and conclusions, and the reasons or basis therefore, on all the

material issues of fact, law, or discretion presented on the record."  5 U.S.C. § 557(c) (1994).

When a court reviews the NLRB's opinion, it must "hold unlawful and set aside agency action, findings, and conclusions found to by . . . unsupported by substantial evidence."  5 U.S.C. § 706(2)(E) (1994); see also 29 U.S.C. § 160(e) (the court must determine whether the Board correctly applied the law and whether its findings of fact are supported by substantial evidence on the record considered as a whole); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); NLRB v. American Linen Supply Co., 945 F.2d 1428, 1431 (8th Cir. 1991).  Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Universal Camera, 340 U.S. at 477 (citation omitted).

### III.   DISCUSSION

The parties do not dispute that the strike began as an economic strike; nor do the parties dispute the ALJ's findings that the Company committed the ULP's alleged in the amended complaint in this case.  The first issue to be addressed, therefore, is whether the Board erred in concluding that the ULP's committed by Company agents converted the Union's economic strike into an unfair labor practice strike.

The commission of ULP's by an employer during a strike that began as an economically motivated strike does not automatically convert that strike into an unfair labor practice strike.  Gaywood Mfg. Co., 299 NLRB 697, 700 (1990); C-Line Express, 292 NLRB 638, 638 (1989).  Rather, the NLRB "General Counsel must establish that the unlawful conduct was a factor (not necessarily the sole or predominant one) that caused a prolongation of the work stoppage."  C-Line, 292 NLRB at 638; see also Gaywood, 299 NLRB at 700.  In other words, there must be a causal connection shown between the

employer's unlawful conduct and a prolongation of the strike.  See, e.g., Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1079-80 (1st Cir. 1981).

Both subjective and objective factors may be probative of conversion. Id. at 1080.  Applying a subjective analysis, the Board and reviewing court may give substantial weight to the strikers' own characterization of their motive for continuing to strike after the unfair labor practice.  Applying an objective analysis, the Board and reviewing court may consider the probable impact of the ULP in question on reasonable strikers in the relevant context.  Id.  Although the record will often permit an evaluation of whether the strikers' knowledge of, and subjective reactions to, an employer's unlawful conduct led to a prolongation of the work stoppage, the presence or absence of evidence of such subjective motivations is not always the sine qua non for determining whether a conversion has occurred. C-Line, 292 NLRB at 638.  Rather, certain types of unfair labor practices by their very nature will have a reasonable tendency to prolong a strike. Id.; see, e.g., Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 276 (8th Cir. 1983) (employer's withdrawal of union recognition clearly prolonged strike because it put an end to contract negotiations).

In considering the strikers' subjective motivations in this case, the ALJ determined that

> the single most compelling aspect of the entire record is that each of the former striking employees, who testified on behalf of the General Counsel, stated that, notwithstanding the aforementioned unfair labor practices committed while the strike continued, the discussions at their union meetings, with regard to continuing the strike, centered on the need for a collective-bargaining agreement and on the desire to be treated fairly in any agreement.  Other than Theresa Otto, not one witness mentioned the unfair labor practices as even being a factor in the decisionmaking process . . . .

<u>F.L. Thorpe</u>, 315 NLRB No. 22, at 13.  In reversing the ALJ, however, the Board concluded that the record contains "ample evidence that the strikers' subjective motivations for continuing the strike in fact did change as a result of the unfair labor practices."  <u>Id.</u> at 4.  Significantly, in reaching this conclusion, the Board <u>inferred</u> a change in the strikers' subjective motivations based upon its conclusion that the ULP's "caused consternation among the employees so as to prolong the strike."  <u>Id.</u>

In <u>Chicago Beef Co.</u>, 298 NLRB 1039 (1990), <u>enforced</u>, 944 F.2d 905 (6th Cir. 1991), the NLRB held that an economic strike had been converted into an unfair labor practice strike as a result of the employer's unlawful conduct; in support of its decision, the NLRB relied upon subjective evidence (i.e. strikers' testimony) that the employer's unlawful conduct "caused consternation among the striking employees."  <u>Id.</u> at 1040.  The NLRB found further support for its subjective analysis in an analysis of the objective evidence on the record.  <u>See id.</u>

In this case, the Board states that "where, as here, the unfair labor practices are of a type which the Board has found <u>objectively</u> tend to prolong a strike, the Board has inferred a change in strikers' subjective motivations where there is evidence that the unfair labor practices `caused consternation among the striking employees.'"  <u>F.L. Thorpe</u>, 315 NLRB No. 22, at 4 (emphasis added) (citing <u>Chicago Beef</u>, 298 NLRB at 1040).  We hold that the Board committed legal error in analyzing the strikers' subjective motivations by ignoring entirely the strikers' testimony which clearly establishes that the work stoppage in this case remained economically motivated throughout the length of the strike, and instead using objective criteria to infer conversion to a ULP strike under the "caused consternation" test.

Furthermore, we find the Board's holding that the strike converted to an unfair labor practice strike to be unsupported by

-10-

substantial evidence on the record.  As the ALJ aptly noted, the most compelling aspect of the record in this case is the testimony of striking employees who indicated that, notwithstanding the ULP's committed by Company agents, the discussions at union meetings centered upon the need for a collective bargaining agreement and the desire to be treated fairly in any agreement.  For example, during Linda Smith's cross-examination before the ALJ, Smith testified as follows:

> Q:    The reason that you were told at the union meeting you were going out on strike in April [of 1991] was to get a better contract, is that not correct?
>
> . . . .
>
> A:    The union didn't tell us to do this.  We voted it in, all of us girls voted it in, it was our choice to do.
>
> Q:    And your vote was you want to go on strike to get a better contract?
>
> A:    Yes, sir.
>
> Q:    And that's the reason you voted, is that correct?
>
> A:    Yes, sir.
>
> . . . .
>
> Q:    And every time the subject came up [at union meetings] the reason that you voted to continue the strike was to get a better contract, is that not correct?
>
> A:    That's right.
>
> Q:    And that is the reason you are currently out on strike, is that not correct?
>
> A:    Yes, it is.
>
> . . . .
>
> Q:    Is that the stated reason you people are out on strike, to get a better contract?
>
> A:    To get a contract with Thorpe, yes.

-11-

Q: And that's the only reason, is that not correct?

A: Yes, it is.

. . . .

JUDGE LITVACK: And the reason for the continuation, as Mr. Berens asked you, the discussion for continuing the strike centered on the fact that you people wanted to get a better contract?

A: To get a contract, yes.

Trial Transcript at 95-97 ("Tr. at 95-97"). Cindy Kruse similarly testified on cross-examination that the strikers' discussions about continuing the strike always centered around obtaining a more favorable contract. Tr. at 139-44. For example, Kruse testified as follows:

Q: Is the reason that you have been told by the Union that you're striking is to get a better contract?

. . . .

A: It's what we want.

. . . .

Q: Now as to discussions beginning the strike, it was all centered around getting a contract, wasn't it?

A: Yes.

. . . .

Q: Okay. Now have you had discussions since then about continuing the strike?

A: Yes.

Q: And all of those discussions have always centered around getting a contract, haven't they?

A: A contract, and for them to start negotiating.

Q: Yes. So the Company would negotiate better with you and you would get a contract, is that right?

-12-

          A:    Hopefully.

          . . . .

          Q:    That's the reason that's been discussed and why you continue to strike?

          A:    Yes.

          Q:    And there's been no other reasons discussed as to why you've gone on strike, has there?

          A:    No.

          . . . .

          JUDGE LITVACK:    I take it since the strike began employees at union meetings have discussed whether they ought to continue the strike?

          A:    Yes.

          JUDGE LITVACK:    All right.    The reasons that the employees have discussed, do they all have to do with contract reasons, getting better health, better safety conditions, have they all centered on those type[s] of issues?

          A:    Yes.

          JUDGE LITVACK:    Have they involved anything else?

          A:    No.

Tr. at 140, 142-44.  Employees Roxanne Boyer, Susan Cox, Deborah Young, and Kathy Bergstrom also testified on cross-examination that the sole reason discussed among strikers for continuing the strike was to obtain a better contract.  See Tr. at 172-73, 196-97, 211-14, 218-19, 281-84.  Lastly, with regard to the testimony of Theresa Otto concerning the strikers' subjective motivations, Otto's testimony may be characterized as ambiguous, at best. When asked by Judge Litvack whether Sandy Sanke's comments were ever discussed among strikers as a reason for continuing the work stoppage, Otto replied that Sanke's comments "made us angry and more determined to get a fair contract."  Tr. at 236-37.  In an

-13-

effort to pin down Otto's testimony concerning the issue of conversion, Judge Litvack initiated the following exchange:

> JUDGE LITVAK: [I]t's alleged that this was no longer an economic strike, a strike to get a contract, but it turned into an unfair labor practice strike, protesting the activity of the -- the Employer's activities during the strike. Now I'm asking you, did you ever hear any of that expressed as a motivating factor for continuing the strike? That now we're protesting all the things that the company did during the strike.
>
> A:    Yeah.
>
> JUDGE LITVACK: All right. Now tell me what you heard.
>
> A:    Basically --
>
> JUDGE LITVACK: Not basically. I want to know comments that you heard.

Tr. at 239. Otto's subsequent testimony, however, fails to establish that the strikers' subjective motivations had changed; rather, Otto's testimony appears to indicate that the strike continued to be motivated by the strikers' desire to obtain a contract with fair terms and benefits. See Tr. at 239-40. In short, Otto failed to substantiate her affirmative response to the question posed by Judge Litvack.

Moreover, the strikers' testimony is corroborated by additional evidence of subjective intent on the record. As noted, at all times the picket signs solely addressed economic reasons for the strike; at no time did the picket signs change in response to ULP's committed by Company agents. This evidence further belies the Board's conclusion in this case.

Based upon our detailed review of the record in this case, we find the Board's subjective analysis to be unsupported by substantial evidence and otherwise contrary to law. We further

-14-

find that the record is capable of supporting only one conclusion with regard to the strikers' subjective motivations; namely, that at no time subsequent to the strike's inception did the strikers' subjective motivations for continuing to strike change in response to ULP's committed by Company agents.

With regard to an objective analysis, the ALJ noted that the NLRB has held that an employer's "`unlawful conditioning of reinstatement on resignation from the [u]nion is comparable in effect to conduct such as unlawful withdrawal of recognition during an economic strike -- an unfair labor practice that, by its nature, has a reasonable tendency to prolong the strike.'" F.L. Thorpe, 315 NLRB No. 22, at 13 (citing Gaywood, 299 NLRB at 700). The ALJ, however, rejected the General Counsel's argument that, in light of Gaywood,

> notwithstanding the subjective evidence [on the record], including the former striking employees' own belief that the objective of the strike . . . , even in the face of unfair labor practices, remained economic, the mere existence of evidence, establishing the resignation from union membership condition for returning to work, satisfies the General Counsel's burden of proof that [Thorpe's] misconduct prolonged the strike, thereby converting it to an unfair labor practice strike.

F.L. Thorpe, 315 NLRB No. 22, at 14. In so doing, the ALJ noted that in Gaywood the NLRB specifically relied upon crucial evidence of sufficient dissemination of the employer's unlawful condition among the striking employees. Indeed, the ALJ correctly observed that, notwithstanding the broad language adopted in Gaywood, "the subjective fact of dissemination remains necessary to establish that the effect of the [conditioning of reinstatement on resignation from the union] was not isolated." Id. The ALJ found that because the evidence showed that only two of the sixty-seven striking employees (i.e. Smith and Kruse) were aware of the unlawful conditioning of reinstatement on resignation from the

union, evidence of sufficient dissemination was lacking.[2]    The ALJ therefore found that deference should be accorded the abundant testimony offered by the strikers regarding the economic rationale for their strike. Accordingly, the ALJ rejected the General Counsel's contention that the mere fact that Thorpe unlawfully conditioned reinstatement upon resignation from the Union is sufficient, in and of itself, to have converted the employees' economic strike into an unfair labor practice strike.

The Board disagreed with the ALJ's finding that the Company's unlawful conditioning of reinstatement was not sufficiently disseminated. The Board relied in significant part upon the dissemination of Lamphere's statement to Susan Cox.  Notably, however, no evidence was introduced of the time frame within which such dissemination occurred.

Upon review, we agree with the ALJ's decision which recognizes that evidence of sufficient dissemination is necessary in order to establish that the effect of the unlawful conditioning of reinstatement was not isolated.  Given that Lamphere's statement was made prior to the inception of the strike, coupled with the fact that, as the General Counsel conceded, the strike began as an economic strike, the record in this case fails to establish sufficient dissemination of the unlawful conditioning of reinstatement following the inception of the work stoppage.  Rather, as the ALJ found, the record clearly indicates only that two of the sixty-seven strikers were aware of the unlawful

---

[2]    Judge Litvack noted that although Susan Cox received an identical condition from Supervisor Lamphere, such occurred prior to the start of the strike, and evidence that such was disseminated was never placed in any particular time frame.  In addition, the General Counsel conceded that the strike was economically motivated at the outset.  Judge Litvack further noted that the record is bereft of evidence that Tribble's threat to Smith and Kruse regarding the setting back of employees' anniversary dates for each week of the strike was ever disseminated to any other employee.

condition for returning. Accordingly, we find the Board's holding to the contrary to be unsupported by substantial evidence on the record.

Finally, with regard to Sandy Sanke's comments to picketers during June, July and August of 1991, the ALJ found that although the record contained evidence of wide dissemination of these comments among the striking employees, there was no record evidence that such had any impact on the underlying rationale for the strike, which always remained focused upon obtaining a more favorable collective-bargaining agreement. F.L. Thorpe, 315 NLRB No. 22, at 14.

The Board, however, held that in light of Sandy Sanke's high position in the Company's managerial hierarchy, her statements concerning termination reasonably tended to prolong the strike and therefore afforded a sufficient and independent basis for finding a conversion. Id. at 3. We disagree. Although one might infer that comments such as those made by someone of Sanke's stature within the Company might objectively tend to prolong a strike, such comments do not provide an independent basis for finding a conversion in this case in light of the overwhelming subjective evidence to the contrary offered by the strikers themselves that is corroborated by additional record evidence of subjective intent. In short, the Board erred by substituting its own judgment concerning the alleged conversion in place of ample credible record evidence provided and corroborated by numerous strikers in testimony before the ALJ which belies entirely any finding of such a conversion. Indeed, the strikers' testimony is particularly compelling in this case because it clearly is not the "self-serving rhetoric of sophisticated union officials and members inconsistent with the true factual context." C-Line, 292 NLRB at 638 (citing Soule Glass, 652 F.2d at 1080). Accordingly, we find the Board's determination that its objective analysis afforded a sufficient and

independent basis for finding a conversion to be unsupported by substantial evidence on the record.

## IV.  CONCLUSION

For the foregoing reasons we hold that the Board's determination is unsupported by substantial record evidence and, with regard to its subjective analysis in this case, otherwise not in accordance with law. We reverse the decision of the Board holding that the ULP's committed by Company agents converted the Union's strike from an economic strike into an unfair labor practice strike.  Rather, as the ALJ originally found, we find that the record fails to support a finding of conversion in this case. Because we find that no conversion occurred, we need not address the issue of reconversion.  We enforce the Board's order in part and deny enforcement in part, in accordance with this opinion.

A true copy.

        Attest:

                CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-