150 F.3d 1095
 158 L.R.R.M. (BNA) 2901, 135 Lab.Cas. P 10,208,
98 Cal. Daily Op. Serv. 5719,
98 Daily Journal D.A.R. 7963
 CALIFORNIA ACRYLIC INDUSTRIES, INC., d/b/a Cal Spas; G.B.
Manufacturing, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CALIFORNIA ACRYLIC INDUSTRIES, INC., d/b/a Cal Spas; G.B.
Manufacturing, Inc., Respondents.
 Nos. 96-70932, 97-70118.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1998.
Decided July 23, 1998.
 
 Wayne A. Hersh, and Jon G. Miller, Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, Irvine, California, for the petitioners.
 Fred B. Jacob, National Labor Relations Board, Washington, DC, for the respondent.
 Petitions for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board. D.C. No. 21 CA 29450.
 Before: WIGGINS and KLEINFELD, Circuit Judges, and SMITH,* District Judge.
 WIGGINS, Circuit Judge:
 
 
 1
 Following a contentious union organization campaign, the majority of employees at California Acrylic Industries, Inc., d/b/a Cal Spas ("Cal Spas"), voted to strike. Soon thereafter, the employees began picketing Cal Spas' facility. Within a month, the strikers unconditionally offered to return to work; Cal Spas, having hired replacements, refused their offer. The National Labor Relations Board ("NLRB"), adopting the recommended order of an Administrative Law Judge ("ALJ"), ruled that the strike was an unfair labor practice strike and ordered Cal Spas to reinstate the striking employees with back pay. Cal Spas timely petitions this court for review of the NLRB's order. The NLRB cross-petitions for enforcement of its order. We enforce the NLRB's order in part and deny enforcement in part.
 
 BACKGROUND[1]
 
 2
 Cal Spas manufactures spas, gazebos, saunas, and pool tables at its facility in Pomona, California. In March of 1993, the United Electrical, Radio and Machine Workers of America (the "Union") began an organization campaign among the production and maintenance employees at Cal Spas' Pomona facility.
 
 
 3
 During the organization campaign, Cal Spas engaged in several unfair labor practices: Cal Spas threatened to move its business, coercively interrogated employees, and coercively disciplined an employee for engaging in union activity. Cal Spas does not dispute these violations. The NLRB did not find that these unfair labor practices were a cause of the June 18 strike.
 
 
 4
 On May 28, 1993, the Union filed a petition for a representation election with the NLRB's Regional Director for Region 21. A few days later, Cal Spas' management rented videocamera equipment and purchased blank videotapes. This equipment was provided to Cal Spas' security guards. On June 4, a security guard videotaped a meeting between employees and Union representatives during the employees' lunch hour. Despite some contradictory testimony by Cal Spas' management, Cal Spas denies that the guard videotaped this meeting. In the alternative, Cal Spas maintains that any videotaping was justified by Union violence or trespass.
 
 
 5
 In early June, Cal Spas filed an unfair labor practice charge against the Union, alleging that the Union had committed acts of violence during the organization campaign. On June 14, the Regional Director for Region 21 issued an order indefinitely postponing the representation election petition hearing, which had been scheduled for June 17, pending investigation of Cal Spas' unfair labor practice allegations. On June 16, the Union's organizing committee met and discussed the possibility of a strike. Several Union members later testified before the ALJ that they discussed the June 4 videotape surveillance at that meeting.
 
 
 6
 The next night, a larger group of Union organizers and employees met to discuss their options. During the meeting, the Union organizers decided to request a strike vote at the June 18 rally at Cal Spas' Pomona facility. Cal Spas alleges that the decision to strike was made at the June 17 meeting because Union members believed Cal Spas had blocked the election.
 
 
 7
 On June 18, the Union conducted a rally outside Cal Spas' Pomona facility. Union Representative Humberto Camacho addressed the many employees in attendance. Reading from a prepared text, he stated that the employees of Cal Spas were outraged that Cal Spas had, among other things, "videotaped and surveilled our discussions with union representatives, in violation of Section 8(a)(1) of the Act." Cal Spas denies that Camacho ever mentioned the surveillance. Vicente Castillo, a Cal Spas' employee, then asked the employees to vote on a strike. A majority of the employees voted to strike. As a result, the employees stopped working and began picketing Cal Spas' facility.
 
 
 8
 On July 19, Camacho, on behalf of the striking employees, tendered Cal Spas an unconditional offer to return to work. After delivering this unconditional offer to return, the striking employees continued to picket. Cal Spas refused the offer to return, stating that the workers had been replaced because of their participation in an economic strike. Furthermore, Cal Spas claimed that widespread sexual harassment by striking employees vitiated any right to reinstatement.
 
 
 9
 The NLRB issued complaints against both Cal Spas and the Union. The NLRB severed the case against the Union and, on December 5, 1994, an ALJ began a hearing on the charges against Cal Spas. After the hearing, the NLRB issued an order affirming the ALJ's rulings, findings, and conclusions that the June 18 strike was caused, in part, by the June 4 videotape surveillance, an unfair labor practice under section 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1). Consequently, the NLRB found that the strike was an unfair labor practice strike and that the employees were entitled to reinstatement. In addition, the NLRB rejected Cal Spas' claims that widespread sexual harassment by striking employees vitiated any right to reinstatement.[2]
 
 
 10
 Cal Spas timely petitions this court for review of the NLRB's order. The NLRB timely cross-petitions for enforcement of its order.
 
 STANDARD OF REVIEW
 
 11
 We "will enforce a decision of the NLRB if 'its findings of fact are supported by substantial evidence and if the Board correctly applied the law....' " New Breed Leasing Corp. v. NLRB, 111 F.3d 1460, 1464 (9th Cir.) (quoting Retlaw Broad. Co. v. NLRB, 53 F.3d 1002, 1005 (9th Cir.1995)), cert. denied, 118 S.Ct. 366 (1997). "Evidence is substantial when reasonable minds might accept it as adequate to support a conclusion, even if reasonable minds might also draw a second, inconsistent conclusion from the same evidence." NLRB v. Bakers of Paris, Inc., 929 F.2d 1427, 1441 (9th Cir.1991).
 
 DISCUSSION
 I.
 
 12
 The first issue in this case concerns the alleged videotaping of Union activity by Cal Spas' security guards. The NLRB concluded that Cal Spas violated section 8(a)(1) of the Act when it videotaped a meeting between Union organizers and employees on June 4, 1993. Cal Spas contends that it did not videotape any Union activity on June 4. We conclude that substantial evidence in the record supports the NLRB's finding. In the alternative, Cal Spas argues that any videotaping was justified and not coercive. We disagree; the surveillance amounted to an unfair labor practice under section 8(A)(1).
 
 A.
 
 13
 The NLRB relied on many sources of evidence in finding that Cal Spas videotaped Union activity on June 4. First, General Counsel's Exhibits 3 and 5 are photographs which depict a Cal Spas security guard operating a videocamera during what appears to be Union organizing activity. These photographs confirm that Cal Spas rented and used video equipment. Second, Union organizers Humberto Camacho and David Bacon testified that the photographs were taken on June 4 during a meeting with Cal Spas employees. Third, Cal Spas' own witness, Robert Suminski, confirmed that Cal Spas "rented the [video] cameras on the 3rd" of June. Fourth, Suminski testified that the photographs in Exhibits 3 and 5 were taken in "the early June days." Another Cal Spas witness conceded that the pictures were taken before the strike. This evidence clearly supports the NLRB's conclusion that Cal Spas videotaped Union organizing activities on June 4.
 
 
 14
 Given the above evidence, the NLRB did not err when it discredited the testimony of Cal Spas' other witnesses. Some of these witnesses testified that the videocameras were obtained only after the strike had begun and were to be used only to record strike-related incidents. That testimony conflicts with the admission by Suminski that the exhibit photographs were taken in "the early June days." Furthermore, we must accord substantial deference to the ALJ's evaluation of the testimonial evidence. See Penasquitos Village, Inc. v. NLRB, 565 F.2d 1074, 1078 (9th Cir.1977) (noting that we give the ALJ's determination of credibility significant weight "for the obvious reason that he or she 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records' "). The ALJ found the Union's witnesses more credible than Cal Spas' witnesses on this issue. That credibility determination, coupled with the General Counsel's photographic exhibits, constitutes substantial evidence upon which the NLRB could base a finding that Cal Spas videotaped protected organizing activity on June 4. Consequently, we will not disturb that finding.
 
 B.
 
 15
 The NLRB further concluded that Cal Spas' videotaping of Union activity on June 4 was an unfair labor practice in violation of section 8(a)(1) of the Act. Cal Spas argues that, even if the videotaping occurred, it was not an unfair labor practice because it was justified and not coercive. A review of the record, however, confirms that the NLRB did not err when it characterized the surveillance as an unfair labor practice.
 
 
 16
 Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 7 of the Act guarantees employees the right, inter alia, to "form, join, or assist labor organizations." 29 U.S.C. § 157. The NLRB and the courts have long recognized that employers violate section 8(a)(1) by engaging in activity that tends to chill an employee's freedom to exercise his section 7 rights. See, e.g., NLRB v. Southern Md. Hosp. Ctr., 916 F.2d 932, 940 n. 7 (4th Cir.1990).
 
 
 17
 We have stated that "[i]n the absence of proper justification, the photographing of pickets violates the Act because it has a tendency to intimidate." Kallmann v. NLRB, 640 F.2d 1094, 1098 n. 5 (9th Cir.1981). Similarly, the photographing of union activity during an organizational campaign tends to create fear among employees of future reprisal. Thus, it chills an employee's freedom to exercise his section 7 rights. The NLRB has extended the prohibition against photographing employees to videotaping employees. See F.W. Woolworth Co., 310 NLRB 1197 (1993). We agree with this extension. Absent legitimate justification, Cal Spas' videotape surveillance of protected concerted activity on June 4 was an unfair labor practice.
 
 
 18
 Cal Spas argues that its June 4 surveillance was justified to document Union trespass and/or violence. The NLRB properly rejected this claim. First, Cal Spas' purported evidence of trespass, General Counsel Exhibit 6, does not support its contention. That photograph shows Union Representative Camacho standing on a public sidewalk, speaking with Cal Spas employees. The employees were permitted to congregate and engage in organizing activities on Cal Spas' property during their lunch hour. Consequently, the photograph does not show a trespass.
 
 
 19
 Second, Cal Spas' claim that surveillance was justified because of Union violence is also meritless. Employers are not allowed to photograph protected activity simply because they fear "something might happen." See F.W. Woolworth Co., 310 NLRB 1197 ("[P]hotographing in the mere belief that 'something might happen does not justify [employer's] conduct when balanced against the tendency of that conduct to interfere with employees' right to engage in concerted activity.' "). Cal Spas argues that it anticipated violence, but it did not show a basis for that purported concern. The NLRB found, on substantial evidence, that anticipated violence did not motivate Cal Spas to obtain the videocameras; rather, they were obtained for purposes of surveillance of legal organizing activity. In light of Cal Spas' merely conclusory allegations about Union violence prior to the strike, the NLRB did not err when it found that Cal Spas lacked proper justification for videotaping protected activity.
 
 
 20
 In sum, the NLRB properly held that Cal Spas' surveillance of protected activity on June 4 occurred and was an unfair labor practice in violation of section 8(a)(1) of the Act. The surveillance was not justified by Union misconduct.
 
 II.
 
 21
 The larger and more difficult issue in this case is whether the NLRB erred when it found that the June 18 strike was an unfair labor practice strike, rather than an economic strike. The significance of that conclusion is that only unfair labor practice strikers are entitled to reinstatement with back pay, even when they have been replaced. See NLRB v. International Van Lines, 409 U.S. 48, 50-51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972). Cal Spas contends that the evidence does not support the NLRB's finding; in its view, the strike was motivated solely by economic concerns. After a thorough review of the record, we agree. There simply is not substantial evidence to support the NLRB's conclusion that the strike was an unfair labor practice strike. It was, instead, an economic strike. Consequently, the strikers are not entitled to reinstatement.
 
 
 22
 It is well-established that an unfair labor practice need only be a contributing cause of a strike to produce an unfair labor practice strike. We have noted that a strike based in part on an unfair labor practice is " 'an unfair labor practice strike, even though other reasons [are] also present, since one of the reasons for it [is] to protest an unfair labor practice.' " Airport Parking Management v. NLRB, 720 F.2d 610, 614 (9th Cir.1983) (quoting NLRB v. West Coast Casket Co., 205 F.2d 902, 907 (9th Cir.1953)); accord Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814, 820 (6th Cir.1975) ("If an unfair labor practice is a 'contributing cause' of a strike, then, as a matter of law, the strike must be considered as an unfair labor practice strike.").
 
 
 23
 In finding that the strike was based in part on Cal Spas' illegal surveillance, the NLRB relied solely on statements made by Union Representative Camacho during the June 18 rally.[3] The NLRB found, based largely on credibility assessments, that Camacho read from a prepared list of alleged unfair labor practices. This list included the illegal surveillance. Camacho also spoke about economic grievances. Following Camacho's speech, another representative requested a strike vote; a majority of employees then voted to strike. The NLRB reasoned that if Camacho discussed the surveillance prior to the strike vote, the unfair labor practice was necessarily a contributing cause of the strike: "[W]hat is of controlling significance herein is what Camacho said to [Cal Spas'] assembled employees on June 18 as the justification or justifications for their collective decision to engage in a work stoppage...." In effect, the NLRB adopted a per se rule that whenever a union organizer discusses an unfair labor practice with employees prior to a strike vote, the resulting strike is an unfair labor practice strike.
 
 
 24
 We reject this mechanical rule because it places form over substance. Under the rule, any strike following an unfair labor practice is an unfair labor practice strike provided the union organizers had the foresight to mention the unfair labor practice before the vote. Needless to say, this rule invites manipulation. The proper inquiry is whether, under the circumstances in each case, the employees voted to strike at least in part because of the unfair labor practice. In this case, the record does not provide substantial evidence that they did.
 
 
 25
 The only evidence used to support the NLRB's conclusion is Camacho's pre-strike mention of the surveillance. Meanwhile, the record is replete with evidence that the strike was not motivated by the unfair labor practice. First, the strike occurred soon after the Regional Director postponed the June 17 representation election petition hearing--a postponement issued in response to Cal Spas' filing of an unfair labor practice charge against the Union. In contrast, the strike was some two weeks after the June 4 surveillance. While not entirely inconsistent with a determination that the surveillance was a contributing cause of the strike, the timing of the strike strongly suggests it was a recognition or economic strike, undertaken to protest Cal Spas' blocking of the election.[4]
 
 
 26
 Second, Union literature issued before and after the strike vote enumerated causes and justifications for the work stoppage, but failed altogether to mention the June 4 surveillance. Instead, the leaflets focused on economic concerns, including lack of medical insurance and low wages. This failure to mention the surveillance suggests that it was not a contributing cause.
 
 
 27
 Third, Union Representative Camacho appeared before the Pomona City Council during the strike and informed them that "[t]hrough [Cal Spas'] action, our right to vote was taken away.... We went on strike because the company denied us that right to vote on a union." All of his comments pertained to economic or Union representation issues. He did not mention the surveillance as a contributing cause.
 
 
 28
 Fourth, an objective observer, newspaper reporter Jeremy Sullivan, who was present at the June 18 rally, testified that he was told by "some folks who represented themselves as being with the [Union]" that the strike was a "recognitional [sic] strike." He was not told that the Union intended to protest the June 4 surveillance.
 
 
 29
 Finally, most of the striking employees filed claims for unemployment insurance with the State of California. The necessary forms require the employee to explain, in detail, why he is no longer working for his previous employer. The ALJ entered five of these employment separation statements into the record; none of them mentions the surveillance as a cause of the strike. Instead, they focus on lack of insurance, low pay, and long hours, the hallmarks of an economic strike.
 
 
 30
 The NLRB discounted this overwhelming evidence simply because Camacho mentioned the surveillance prior to the strike vote. If the June 4 unfair labor practice was truly a contributing cause of the strike, however, one would expect it to be reflected somewhere other than solely in a prepared list read by Camacho at the pre-strike rally. There is no mention of it in pre- or post-strike Union literature, in Camacho's address to the Pomona City Council, or in the employees' unemployment insurance claim forms. In short, the only evidence that the surveillance was a cause is Camacho's pre-strike statement. In light of the copious evidence that the strike was motivated solely by economic concerns, that one statement cannot fairly be characterized as substantial evidence. Therefore, we reject the NLRB's finding and hold that the strike was an economic strike.
 
 
 31
 Our conclusion is supported by the analysis in several similar cases. In NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691 (7th Cir.1976), the Seventh Circuit rejected the NLRB's finding of an unfair labor practice strike. As in our case, the record showed that the union representative discussed the unfair labor practice with the employees before the strike vote. The court, however, rejected that evidence as insufficient to show causation because the remainder of "the record evidence overwhelmingly point[ed] to the conclusion that recognition was the object, solely and simply, with window-dressing of propriety being found in the supposed unfair labor practice charges." Id. at 705. The court emphasized that the strike occurred many days after the unfair labor practices and that the union testimony about the cause of the strike was incredible. The court believed that the union was "engaged in 'an ex parte effort to make a record by assuming an attitude which was inconsistent with other facts definitely established.' " Id. at 705 (quoting Winter Garden Citrus Prods. Coop. v. NLRB, 238 F.2d 128, 130 (5th Cir.1956)). In our case, there is even more evidence that the strike was not "bottomed in part upon unfair labor practices." Id. at 704 (quoting Winter Garden, 238 F.2d at 129).
 
 
 32
 Likewise, in F.L. Thorpe & Co., Inc. v. NLRB, 71 F.3d 282 (8th Cir.1995), the Eighth Circuit rejected the NLRB's finding that an unfair labor practice converted an economic strike into an unfair labor practice strike. The court relied on the statements of employees which indicated that the strike was continued solely for economic reasons. See id. at 288-90; see also NLRB v. Vanguard Tours, Inc., 981 F.2d 62, 65 (2nd Cir.1992) (rejecting the NLRB's finding of an unfair labor practice strike because "[e]ach employee who testified as to the cause of the strike articulated exclusively economic rationales"). In addition, the court emphasized that "at all times the picket signs solely addressed economic reasons for the strike." Id. at 290. Similarly, in our case, the employment separation statements and Union communications made to the media and the Pomona City Council revealed that the strike was bottomed on economic concerns; additionally, pre- and post-strike Union literature did not refer to the June 4 surveillance. This evidence leads us to the same conclusion reached in Colonial Haven and Thorpe: the strike was an economic strike.
 
 
 33
 In sum, the NLRB erred by holding that whenever a union organizer mentions an unfair labor practice prior to a strike vote, any subsequent strike is necessarily an unfair labor practice strike. The proper inquiry is whether the employees actually voted to strike at least in part because of the unfair labor practice. After thoroughly reviewing the record, we are unable to find substantial evidence that they did. The vast majority of the evidence points to one inescapable conclusion: the strike was motivated solely by economic concerns. To ignore this evidence is to permit union organizers to transform an otherwise economic strike into an unfair labor practice strike simply by invoking a few magic words. See Colonial Haven, 542 F.2d at 705 (rejecting the union's ex parte effort to make a record by adopting an attitude inconsistent with other facts). This we refuse to do. Accordingly, we reject the NLRB's causality determination and hold that the June 18 strike was an economic strike.
 
 III.
 
 34
 Because we conclude that the June 18 strike was an economic strike, Cal Spas "may refuse to reinstate [the] strikers if in the interim [it] has taken on permanent replacements." NLRB v. International Van Lines, 409 U.S. 48, 50, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972). Consequently, we deny enforcement of that part of the NLRB's order that requires reinstatement and back pay. In all other respects, we enforce the NLRB's order.CONCLUSION
 
 
 35
 We enforce the NLRB's order in part and deny enforcement in part, in accordance with this opinion.
 
 
 
 *
 Hon. Fern M. Smith, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 We adopt these facts from the NLRB's order. Cal Spas, however, challenges several of these findings. We note, therefore, any relevant disagreements by the parties
 
 
 [2]
 The order also concluded that Cal Spas had engaged in other unfair labor practices that did not contribute to the employees' decision to strike. Cal Spas does not challenge that portion of the order
 
 
 [3]
 Union officials also testified during the hearing that the illegal surveillance was discussed during pre-strike meetings. The NLRB, however, did not rely on this testimony in concluding that the surveillance was a contributing cause of the strike
 
 
 [4]
 Indeed, several Union organizers conceded that they discussed the postponement during the June 17 meeting at which the decision to seek a strike vote was made